## THIRD NAT. BANK OF MIAMI v. DETROIT FIDELITY & SURETY CO.

### No. 6890.

Circuit Court of Appeals, Fifth Circuit.

June 8, 1933.

Rehearing Denied July 11, 1933.

Marshall C. Wiseheart and H. H. Taylor, both of Miami, Fla., for appellant.

H. C. Tillman and G. L. Reeves, both of Tampa, Fla., for appellee.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

SIBLEY, Circuit Judge.

Detroit Fidelity & Surety Company became surety upon the bond of Central Station Equipment Company for $532,000 for the performance of a contract with state highway department of Florida to build a bridge and to promptly make payment to all persons supplying labor, materials, and supplies used directly or indirectly in the prosecution of the work. On October 18, 1930, the surety company filed a bill quia timet to ascertain the unpaid bills against the job for which it was liable, and to have applied to them the reserve percentages due to the contractor which were by the highway department held back under the contract as security. The Third National Bank of Miami asserted as assignee labor claims amounting to $48,873, which the master allowed, but the judge rejected because it was thought the bank had acted unfairly to the surety company in accumulating them without notice to it and had thereby released it. The bank appeals.

The facts fairly appearing are that the contractor for the purposes of this job only opened a deposit account with the bank, borrowing from it $15,000, which was put therein, and the highway department by letter agreed to send the monthly installment pay checks to the bank. Materials, labor, and supplies for the job were paid by the contractor checking on the bank, and indorsing and depositing the installment checks as received, and borrowing other funds as needed. The indebtedness became larger than the bank wished to carry, and about December 11, 1929, the bank and contractor agreed that the bank would furnish money for pay rolls on assignment to it by each laborer of his claim as paid to him, and that materials and other expenses for the job should be paid through the checking account as before. It was thought the accumulating reserved percentages would eventually take care of the labor claims. Each week thereafter, when the contractor made out his pay roll, it was sent to the bank, which provided money to cover it, and the paymaster, as he paid each laborer, took a written assignment to the bank of his claim against the contractor. These were by the paymaster turned in to the bank. From time to time the bank, in order to put these claims in bankable shape, took a demand note from the contractor covering them, but not as a payment of them, for the assignments were also retained. In June, 1930, they amounted to some $37,470. At that time a representative of the surety company visited the job and called on the bank, and was informed of this amount due it. The records

of the bank were opened to him, but he did not examine them. There was no concealment or misrepresentation. This representative had with him an installment pay check for $10,000, and was asking the bank to release part of it for application to a bill for material. This the bank did, and the balance he turned over to it. He testifies: "If the Bank was agreeable to lend this money I was perfectly agreeable to let them have a portion of this money. * * * Some mention was made about the payroll, that Mr. Hill, (the Bank president), was giving them money to meet the payroll and pay material bills on the job, and that was the primary thing I was interested in, to see that the money was not diverted to other jobs. * * * No mention was made of assignments or anything like that, but Mr. Hill gave me the impression that these boys were to pay him the estimates as they received them, and he was perfectly willing to loan them money from time to time as long as they needed it, and on this assurance that the banking situation in Miami was sound I agreed to give them the money." He told the president, after knowing the amount due the bank, that there would be a profit in the job estimated at $25,000. By October, however, when the job was ended, although the checking account was kept in good shape and the notes due the bank other than for labor debts were paid, the last named had mounted to $48,873. The bank wrote to the chairman and engineer of the highway department, reminding them of the bank's advances, and asking that the warrants for final payment come to it. A few days later the surety company filed this bill. The bank then notified the surety company of the amount and nature of its claim, and was made a party. The surety company collected the final payments amounting to about $60,000 on February 26, 1931. We infer that this sum is not sufficient to cover all claims, though there is no finding of that fact nor evidence thereof in the record.

We think the loss, if any, is on the surety company and not on the bank. There is no dispute but that the wage claims were originally secured by the bond. If by reason of the percentages retained by the highway department the contractor could not at once pay them, and the wage-earners had waited for the final payment, they would not have forfeited their security. Had they definitely agreed to wait and had taken notes payable at a near definite date, the indulgence would not release the surety on a bond such as this. United States Fidelity & Guaranty Co. v. United States, 191 U. S. 416, 24 S. Ct. 142,

48 L. Ed. 242. Instead of waiting, the wage-earners realized their money by selling and assigning their claims and the assignee waited. The assignments are valid, and the surety is not prejudiced nor discharged. United States F. & G. Co. v. United States (C. C. A.) 189 F. 339, affirmed 231 U. S. 237, 34 S. Ct. 88, 58 L. Ed. 200; Title Guaranty & Trust Co. v. Puget Sound Engine Works (C. C. A.) 163 F. 168; United States v. Rundle (C. C. A.) 100 F. 400. These decisions under the federal public works statute, 40 USCA § 270, are regarded as applicable to the statute of Florida, Comp. Gen. Stats. 1927, § 5397, which is a practical rescript, and the Florida court so cites them. J. B. McCrary Co. v. Dade County, 80 Fla. 652, 665, 86 So. 612; Kidd v. Jacksonville, 97 Fla. 297, 120 So. 556; Fulghum v. State, 94 Fla. 274, 114 So. 367; City of Stuart v. American Surety Co. (C. C. A.) 38 F.(2d) 193. The surety under both statutes is bound both for the performance of the contract and for the payment of labor, material, and supplies. He is not ordinarily hurt by arrangements such as those mentioned not extending beyond the period of the job, seeing that he himself would have to pay if some such arrangements were not made. The surety's real concern is to see that none of the contract price is diverted from the job. We have had recent occasion to establish touching the surety's rights the following propositions: First, that a bank by merely lending to a contractor under such a statute the money to pay for labor or materials acquires no right under the bond against the surety. First National Bank of Dothan v. American Surety Co. (C. C. A.) 53 F.(2d) 746. Second, the reserved percentages held back under the contract by the public authority until final settlement constitute a pledged security both to the public and to the surety for the performance of the contract, the proper application of which the surety may require, recalling it if misapplied by any one having notice. Glades County v. Detroit Fidelity & Surety Co. (C. C. A.) 57 F.(2d) 449. Third, this pledged reserve is to be distinguished from the regular installment payments which, in the absence of a statute or agreement to the contrary, are under no pledge or trust, but belong to the contractor, and checks representing them may in general be validly negotiated in due course of trade, even to one who knows their origin. Kane v. First National Bank of El Paso (C. C. A.) 56 F.(2d) 534. There is, however, held to be a limitation on the use of these installments to pay one who has two claims against the contractor, one relating to the job

and one not so relating, but this is not because the installments are a pledge or trust, but because of the law of application of payments when the rights of third persons are inequitably affected by the application. Thus in Columbia Digger Co. v. Sparks (C. C. A.) 227 F. 780, it is held that in such circumstances there are equitable rights in the surety to have the money applied to the debt on which he is bound, thus limiting the ordinary right of debtor and creditor to apply a payment as they please. So in Standard Accident Insurance Co. v. Duval Lumber Co., 99 Fla. 525, 126 So. 643. Assuming these cases to be well decided, they do not apply here.

This bank had no outside debt to which it was diverting funds from this job at the surety's expense. Standing both as the assignee of the labor claims and as the advancer of money to pay material bills under agreement to be reimbursed by the installment checks, it has done the surety no wrong in applying the installment checks to the latter. The surety was as much bound for material as for labor, and would have to procure and pay for both if the contractor did not. The installment payments are by the contract left free that the contractor may use them in getting both or either. Whether he uses them to pay laborers and materialmen directly or to repay some one who temporarily advances the money for that purpose, he does what is expected and that to which the surety has no right to object. In this case there was no diversion of funds from the job. That the funds should prove insufficient is one of the risks deliberately assumed by the surety company. It cannot recall payments already made and applied to the bank's advances for material, in this case made with its own knowledge and encouragement, and thus put the loss in the job on the bank instead of on itself.

The surety nevertheless has an interest in the conduct of the job, and has the right to fair treatment and full information. But, if information is desired, he must ask it. There is no duty on persons with whom the contractor may deal to give particular notice of the dealing to the surety. The surety is represented by the contractor in the ordinary business of the job. The bank was not bound to notify the surety company of the arrangements it in good faith had made with the contractor to carry on the work. The surety in fact knew of them in a general way, and had full opportunity to learn any desired detail. Its representative knew the true amount due the bank, and that it arose from

advances for labor and material, and he expected the amount to be repaid to the bank, and, after such payment, estimated a profit of $25,000; and he intentionally encouraged the bank to continue the advances. They were and would be no greater because some of the claims were assigned instead of paid. The job owed the same amount either way. It is not to be supposed the surety company intended to lure the bank into making advances and then to prevent repayment of them. It is argued that the surety company, if it had known that the wage claims were preserved in such shape as to be enforceable against it, might have taken the job over. But why should it? It knew the amount of them, and yet figured the job would show a profit. With the job on its hands, it must have paid past assignments and all future labor and material claims. It nowhere appears that any loss occurred which would have been avoided, or that the surety company is any worse off than it would have been if it had been informed that the $37,470 due the bank on the job in June was assigned wage claims. The legal right is with the bank, and we see no fraud, misapplication of payments, or concealment creating estoppel which should prevent its assertion. The case of Fulghum v. State, 94 Fla. 274, 114 So. 367, is not in point. It rebuked the intentional systematic diversion of the money from the job to the payment of debts due a bank by the contractor, which had no relation to the job or to the surety's obligation. The bank here ought to have judgment on its claim, and we direct that it be entered.

Judgment reversed, with direction.