COCONUT GROVE EXCHANGE BANK v. NEW AMSTERDAM CASUALTY CO.

No. 11176.

Circuit Court of Appeals, Fifth Circuit.

April 23, 1945.

Rehearing Denied May 17, 1945.

Leland Hyzer, of Miami, Fla., for appellant.

Francis M. Holt, of Jacksonville, Fla., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

J. Victor Martin, referred to hereafter as "the Contractor", on June 30, 1941, entered into two contracts with the Farm Security Administration of the Federal Government, hereafter referred to as "the Government", for the construction of certain housing facilities in Dade County, Florida, to guarantee the performance of which, as well as the payment of all persons furnishing labor and materials thereunto, the Contractor executed performance and payment bonds, with appellee as surety. The application for the bonds was dated June 19, 1941, antedating the construction contract.

As is often the case in such situations, there was a loan to the Contractor by the appellant Bank, secured by an assignment of monies due from the contract, with a subsequent default by the Contractor. There was also the usual suit by the Surety Company for exoneration wherein it set forth: the contract between the Contractor and the Government; the writing of the bond on the application of the Contractor; the provision for an ·assignment to the Surety Company, upon default, contained in the application for the bond; the default of the Contractor; the finishing by the Surety to its great loss; the amounts paid by it to the Contractor's subcontractors, laborers, and materialmen, as well as the amount not yet paid to them; the amount

of disputed claims, including that due to the Bank by virtue of its loan to the Contractor; the amount due by the Government on the contract; the claim by the Surety Company of a right to receive all of the balance due the Contractor by the owner whether the amount in the hands of the Government is retained percentage or not; the assertion of a prior assignment; the claim of a right to be equitably subrogated so as to stand in the shoes of creditors of the Contractor whose debts the Surety has paid, and for which assignments were taken; the claim of the Surety Company to have rights superior to everybody in the suit to the money in the hands of the Government; the assertion that the claim of the Bank is inferior to the right of the plaintiff; a denial that the Surety is indebted to the Bank; and a conclusion asking: that it be subrogated to the rights of all adverse parties to any monies remaining in the hands of the Government; that its claim to said monies be declared superior to the claims of all defendants in an accounting to be had between the parties; that a judgment against the Contractor and his indemnitors be entered; and that a declaration of rights and liabilities between the parties be made.

After the filing of the suit, and before decree, to wit, on February 20, 1943, the Government paid the sum of $12,220.29 to the Bank in conformity to an assignment made by the Contractor to the Bank on October 8, 1941. However, the Surety Company filed no supplemental complaint, nor amendment to its complaint, seeking a judgment against the Bank for said sum or any part thereof, which omission may or may not have been motivated by a desire on the part of the Surety Company to escape the universal rule that the burden of proof to allege and prove injury or damage should be, and is, upon the mover, in a suit seeking to recover money.[1] Instead of an amendment, or supplemental complaint, seeking a money judgment, which the lower court, nevertheless, ultimately awarded, the Surety Company filed a sworn application for a temporary restraining order to require the Bank to impound the funds paid to it by the Government. No restraining order was entered, and the Bank, after the receipt of the checks from the United States, paid to itself the sum of $6,628.31 as the balance due it by the Contractor as evidenced by his

promissory note, and deposited the residue, $5,591.98, into the registry of the court.

The bases upon which the $12,220.29 was paid to the Bank were assignments dated October 8, 1941, made by the Contractor to the Bank, and accepted by the United States, to secure money lent, and to be lent, by the Bank to the Contractor, and which the Bank alleged was used by the Contractor to meet pay rolls incurred by him in the performance of his said contracts with the Government. The plaintiff never denied the allegation by the Bank that the money was used by the Contractor to meet pay rolls incurred in the performance of the contract, nor did the Surety Company ever allege, or attempt to prove, that the funds, which were admittedly due by the Contractor to the Bank, were ever diverted from the purposes of the contract, or that the funds were not used in the payment of liabilities for which the Surety was liable under its bond, nor does it allege that it was unaware of the arrangement by the Bank to finance the Surety's principal, nor does it assert an absence of acquiescence by it in such financial arrangements.

The total contract price to be paid by the Government was $534,034. At the time of the institution of the suit by the Surety Company there remained due and unpaid by the Government under the contract the sum of $80,527.85, so that the payment of $12,220.29 did not invade the ten per cent retained percentage under the contract, and we are, therefore, not concerned here with retained percentages. The amount paid out by the Surety Company in the fulfillment of the contract greatly exceeded the balance due from the Government under the contract.

The lower court held: (1) That the claim of the Bank against the Surety had not been sustained as being a claim falling within the protection of the bond; (2) That the rights of the Surety Company, as assignee of the Contractor and as assignee of subcontractors and materialmen to the extent of $178,204.02, in and to the sum of the $80,527.85 remaining unpaid by the Government, were superior to the right of the Bank under its assignments from the Contractor; (3) That the Bank, as assignee of the Contractor, acquired no greater rights than the Contractor, and that the rights of the Bank were inferior to the rights of the Surety Company; (4) That

the Bank should "take nothing by its claim against New Amsterdam Casualty ·Company, * * * and that as to such claim said New Amsterdam Casualty Company, a corporation, do go hence without day, and that it do have and recover of and from the said Coconut Grove Exchange Bank, a corporation, its costs herein expended, to be taxed by the Clerk in accordance with law"; (5) That the Bank be permanently restrained from receiving or accepting from the Government or any other source any part of the money still remaining unpaid by the Government; (6) That the Casualty Company do have and recover from the Bank the sum of $12,220.29, together with interest at the rate of eight per cent per annum, together with costs.

The court also directed the jury to find a verdict for the Surety Company against the Contractor and his two indemnitors, as a result of which a verdict of $130,130.08 was found against the said defendants, who had agreed to indemnify the Surety Company, together with the sum of $10,000 as attorney's fee. (Credit for the amount of the judgment against the Bank was allowed on the amount of the verdicts against the said individuals.)

Two. substantial questions are presented by the Bank's appeal, viz.: (1) Whether or not the Bank is protected under Section 203, 31 U.S.C.A., as amended by the Act of October 9, 1940; and (2) Whether the Surety Company, irrespective of the effect of said Section 203, as amended, was not required, in order to state and make out a case for equitable subrogation, to allege and to prove that the funds advanced by the Bank to the Contractor were diverted from purposes essential to the performance of the contract.

Section 203, supra, prior to its amendment on October 9, 1940, provided that all assignments of any claim against the United States of the nature here involved should be absolutely null and void unless, along with numerous other requirements, the assignment of such claim was made after such claim had been allowed, the amount due ascertained, and a warrant for the payment thereof issued. The amendment of October 9, 1940,[2] as counsel for both sides admitted in oral argument, was made for the purpose of aiding contractors in financing national defense contracts. The amendment eliminated the provisions against assignments in any case in which the monies due or to become due from the United States, or from any agency or department thereof, aggregating $1,000.00 or more, were assigned to "a bank, trust company, or other financing institution, including any Federal lending agency", but requiring, in the event of any such assignment, that the assignee thereof should file written notice of the assignment, together with a true copy of the instrument of assignment.

The assignments to the Bank were executed by the Contractor in conformity with the provisions of Section 203, as amended, in that notice thereof was given to the Farm Security Administration on October 10, 1941, and to the Surety Company on March 19, 1942. The Surety Company's conditional assignment was contained in the application of the Contractor for the bond. It was conditional in that it did not

---

[2] The pertinent parts of the amendment read:

"3. That unless otherwise expressly permitted by such contract any such assignment shall cover all amounts payable under such contract and not already paid, shall not be made to more than one party, and shall not be subject to further assignment, except that any such assignment may be made to one party as agent or trustee for two or more parties participating in such financing;

"4. That in the event of any such assignment, the assignee thereof shall file written notice of the assignment together with a true copy of the instrument of assignment with—

"(a) the General Accounting Office,

"(b) the contracting officer or the head of his department or agency,

"(c) the surety or sureties upon the bond or bonds, if any, in connection with such contract, and

"(d) the disbursing officer, if any, designated in such contract to make payment.

Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this paragraph and the following paragraph shall constitute a valid assignment for all purposes.

"Any contract entered into by the War Department or the Navy Department may provide that payments to an assignee of any claim arising under such contract shall not be subject to reduction or set-off, and if it is so provided in such contract, such payments shall not be subject to reduction or set-off for any indebtedness of the assignor to

become effective except upon the default of the Contractor.[3] No notice of this assignment was given to anyone. The Surety contends, and the lower court held, that this conditional assignment was superior to those of the Bank.

The Bank's assignments, being in conformity with the statute, are undoubtedly valid and binding as between it, the Contractor, and the Government. There was no compliance with the provisions of Section 203, supra, with reference to the conditional assignment of the Surety Company, and such assignment does not bind the Government, nor does it lie within Surety's mouth to object to the action of the Government in making the payment of the said $12,220.29 over to the Bank in accordance with the statute and the assignments to the Bank, which the Government had accepted. The fact that the $12,220.29 was in excess of the amount due the Bank is immaterial for the reason that subsection 3 of the amendment to Section 203 provides that unless otherwise expressly permitted by such contract such an assignment *shall cover all amounts payable under such contract* and not already paid, *shall not be made to more than one party*, and shall not be subject to further assignment. The Government, therefore, recognized the one legal assignment made by the Contractor and made payment accordingly.

The Surety Company, however, contends that the amendment to the statute against the assignment of claims against the Government was good as between the assignee and the Government, or the Contractor and the Government, but that it was enacted for the benefit of the Government and in no wise disturbed any legal rights of other parties inter sese. But if this is true, why did the statute require notice of the assignment . to be given the Surety Company, and thus depart from the general rule which requires notice of an assignment to be given only to the obligee? This additional requirement of notice to the Surety is significant in the light of the statute which makes the assignment valid for all purposes, and indicates that the assignment will be valid as against any claims asserted by the Surety Company.

It is settled by the decisions beyond question that the primary purpose of Section 203, supra, before its amendment, was for the benefit of the Government, and in order to keep it from being embroiled in controversies between the contractors and their assignees and creditors. This is also one of the primary *purposes* of the section as amended, but what is the *effect* of the amendment? Why was there a relinquishment of so many conditions which had theretofore made assignments illegal? Even if, as counsel for both parties concede, the amendment was to facilitate the financing of contracts in the aid of national defense and to make it so contractors could borrow money from banks and other lending institutions so as to thereby promote the national defense, it still could not now be accurately asserted that the only *effect* was to protect the Government. The amendment made valid that which had theretofore been void and if it were intended not to affect any rights between the parties relating to the validity of such contracts, why did the Act contain the provision that "*Notwithstanding any law to the contrary* governing the validity of assignments any assignment pursuant to this paragraph and the following paragraph shall constitute a valid assignment *for all purposes*."? (Emphasis added.) If an assignment is valid as to the Government but invalid against the Surety and others, could it be said to be "valid for all purposes"? If the amendment was only for the protection of the Government, why does it provide that the Government could not reduce the assigned claim or set it off by any claim that it has against such an assignor? In addition to protecting the Government, which was the prime purpose of the section before its amendment, as construed in Martin v. National Surety Co., 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822, the amendment of 1940 had the incidental effect of protecting that assignee who filed his assignment and gave notice under the provisions of the statute. Thereafter no other assignment would be

---

the United States arising independently of such contract. As amended Oct. 9, 1940, c. 779, § 1, 54 Stat. 1029."

[3] The assignment in the application contained the following: "This assignment shall be in full force and effect, as of the date hereof, should the applicant fail or be unable to complete the said work in accordance with the terms of the contract covered by said bond, or in the event of any default on the applicant's part under said contract."

effective and all the proceeds would be paid to the one assignee who had complied with the law, provided that assignee were a "bank, trust company, or other financing institution, including any Federal lending agency." An assignment made before "the issuing of a warrant for the payment thereof" to a surety company, which is neither a bank, trust company, financing institution or Federal lending agency, is still void and was not made valid by the amendment. We cannot escape the conclusion that the rights of the surety were incidentally affected.

The assignments to the Bank were: (1) valid; (2) absolute; (3) prior in time to the conditional assignment of the Surety; (4) and conformable to the amendment to Section 203. The assignment to the Surety Company was: (1) conditional; (2) to take effect upon the happening of an event that occurred long subsequent to the execution of the assignment to the Bank; (3) without notice to creditors; (4) without notice to the Government, and plaintiff's evidence is without definite proof as to the time of default that was required to occur in order to call the assignment into effectiveness; (5) was made before issuance of a warrant in payment thereof; and (6) was not to a bank, trust company, or financing institution. We do not think, therefore, that the amendment of October 9, 1940, was not without material effect upon what would otherwise have been the legal rights between the Surety on one hand and an assignee bank on the other. The statute affected the rights of the Surety in that it denied it the right to have a valid assignment since it was not a lending agency, but allowed a bank or other lending agency to obtain an assignment that would be valid "for all purposes".

■ The amendment expressly made it lawful for the Contractor to assign the proceeds of his contract to *a bank,* whereupon all the proceeds shall be paid to that bank, and since it permitted that to be done but did not permit an assignment to a surety company, the amendment did definitely and incidentally affect the rights of the bank and of the surety. But a surety in writing such a bond does so in the light of the amendment and will be held to have accepted its applicable provisions.

It is not necessary for us to determine all the situations in which the rights of the parties might have been incidentally affected by the amendment. It is sufficient to say that the assignments to the Bank entitled it to receive proceeds of the contract, and it was rightfully in possession of the sum of $12,220.29 under its assignments that were not only lawful but exclusive. Moreover, they were prior in time, prior in notice, and prior in right.[4]

■■ Since the Bank was lawfully in possession of these funds under valid and exclusive assignments, and since the plaintiff sought their recovery, the burden was on it to allege and prove such facts as would establish in it an equitable right of such superior force as to displace the appellant's clear legal right before it could have judgment for the amount of such funds. To this end, perhaps, the Surety asserted that even if it were not entitled to recover by virtue of its assignment, nevertheless, it urged that because it had carried out its own undertaking by the completion of its principal's contract, it was entitled to be equitably subrogated to all of the funds due the Contractor at the time of his default. It insisted that its compliance with the terms of its own covenants as Surety entitles it to prevail over, and to the exclusion of, all parties whose claims do not arise out of sub-contracts or the furnishing of labor and materials used in the performance of the contract. But no superior equity in the Surety will appear unless it shows that the money lent by the Bank was diverted, or used for purposes outside the contract, for if the money lent was applied to the payment of labor and materials used in the contract, thereby discharging obligations for which the Surety would otherwise have been liable, the Surety was in no wise injured by the transaction.

---

[4] In Town of River Junction et al. v. Maryland Casualty Co., 5 Cir., 110 F. 2d 278, 282, 134 A.L.R. 727, this Court said: "Moreover as between successive assignments of the same right the assignee first giving notice prevails. 4 Am. Jur., Assignments, § 107. Especially should this be so when the assignment of which notice is first given is a legal one for full value and the second is only an equitable assignment attempted before the thing was in existence; because a bona fide purchaser for value without notice will not be interfered with by a court of equity."

It cannot have its liability discharged with the Bank's money and then recover from the Bank money equivalent to that so used for its benefit by its principal.[5] It is fundamental that one seeking in equity to recover money from another must allege and prove injury—not benefit.

We hold, therefore, that the 1940 amendment of Section 203, while being primarily for the protection of the United States and not for the regulation of the equities of the claimants, as between themselves, nevertheless, did incidentally affect the rights between the assignee of contractor and the surety so as to make assignments to a bank from a contractor for the purposes of the contract valid and the possession by the assignee bank of proceeds of the contract lawful. The $12,220.29 came into the possession of the Bank lawfully by virtue of the only valid assignment that was, or could have been, made under the statute, and anyone seeking to recover any portion of such money had the usual burden of proof. Moreover, to the extent that the money lent by the Bank to the Contractor was used to pay sub-contractors or others furnishing labor and materials used in the performance of the contract, the Surety was not injured, and in the absence of allegations and proof by the Surety Company of a wrongful diversion of funds, it failed to sustain the equitable right which it claims for the recovery of the monies repaid to the Bank.

The lower court erred in rendering judgment against the Bank, and the case is reversed and remanded with instructions to enter judgment in favor of the Bank.

Reversed and remanded with directions.

SIBLEY, Circuit Judge (dissenting).

On the issues made in the pleadings and the facts found by the court I do not think a judgment should be entered for the Bank, but that further facts should

---

[5] In Town of River Junction v. Maryland Casualty Co., supra, this Court, speaking through Judge Sibley, said: "If what is alleged be proven, the Town ought not to be adjudged liable to pay the surety again what has already been paid out for the surety's protection and benefit."

In Third National Bank v. Detroit Fidelity & Surety Co., 5 Cir., 65 F.2d 548, 549, this Court, speaking through the same judge, recognized the principle that the surety must be prejudiced by the act complained of when, in speaking of the validity of assignments taken by a bank that had paid wage claims, it said: "Had they [the wage-earners] definitely agreed to wait and had taken notes payable at a near definite date, the indulgence would not release the surety on a bond such as this. [Citing cases.] Instead of waiting, the wage-earners realized their money by selling and assigning their claims and the assignee waited. The assignments are valid, and the surety is not prejudiced nor discharged. [Citing numerous cases.] * * * The surety under both statutes [Florida and Federal] is bound both for the performance of the contract and for the payment of labor, material, and supplies. He is not ordinarily hurt by arrangements such as those mentioned not extending beyond the period of the job, seeing that he himself would have to pay if some such arrangements were not made. *The surety's real concern is to see that none of the contract price is* *diverted from the job."* (Emphasis added.)

In Town of River Junction v. Maryland Casualty Co., 5 Cir., 133 F.2d 57, 59 (second appeal), this Court, again speaking through Judge Sibley, said: "The surety was bound to see that all labor and material claims were paid, and to carry the job to completion. The claims of laborers and materialmen were a charge or incumbrance on the money due the contractor by the town, and against the surety's own bond. The contractor, embarrassed by delays in paying monthly estimates, and as now appears, by a probable loss in the job, went to the bank to get cash to carry on instead of going to the surety. * * * The surety has gotten its obligations discharged by the money furnished by the bank, with the cooperation of the town. The surety has no moral or equitable right to have the bank pay back or the town to pay again. * * * Whether or not the bank could actively enforce a subrogation against the surety of the claims its money paid, it can at least prevent a recovery in equity by the surety."

(We are not unmindful of the fact that the Court held in the second River Junction case that the burden of showing an equity arising from the application of the money is on the town and the bank, but that was because of the fact that the assignment to the bank therein had failed; consequently it was not shown that the bank was lawfully in possession of the money.)

be found to settle the equities between the Bank and the Contractor's surety. The reason given for entering judgment for the Bank is that the Bank came lawfully into possession of the disputed money pending the suit, and the Surety failed to show that the Bank was not entitled to keep it, having the burden so to do.

The suit was filed Sept. 11, 1942 by the surety against the Contractor, the Bank and others, to settle the liabilities of the surety on the bond and to establish the surety's right by subrogation to receive the remaining money to be paid by the United States, the surety having already performed the defaulting Contractor's contract as respects the United States, and standing ready to pay all outstanding materialmen's claims against the job so soon as they might be settled. It is immaterial whether the relief sought be called exoneration or subrogation, for all claims were settled before the trial and assignments of them taken by the surety to an amount of $178,204. The surety's rights by subrogation and by assignment are fully proven.

Now the Bank in its answer, not yet having received the disputed money, claimed a right to receive some $6,600 from the United States in preference to the surety, because it held an assignment from the Contractor made under the Assignment of Claims Act of Oct. 9, 1940, 31 U.S.C.A. § 203; and because the money it had loaned the Contractor just before his default was in fact used by him for the relief of the surety in paying labor debts on the job. The Bank had the burden of proving these defenses. It proved the assignment, but made no effort to prove what use was made of the money.

Five months after the suit was filed, and after the surety had completed the job, the United States paid the Bank $12,220 as a progress payment, but it does not appear whether any part of the work for which the payment was made was done by the Contractor before his default, or whether it was all done by the surety afterwards. It was paid the Bank as the assignee recognized by the United States. An injunction was sought to prevent the Bank's accepting it, but in the face of that application the Bank took the money, paid itself, and paid the rest into court. Now it does not seem to me that the Bank could in this manner improve its position or alter in any way the rights of itself

and the surety. It must be regarded that the Bank received the money subject to the outcome of the pending suit, and not even the burden of proof was affected thereby.

The surety having established its case, as above stated, the Bank did not prove a special equity which we recognized in Town of River Junction v. Maryland Casualty Co., 5 Cir., 133 F.2d 57, as sufficient to prevent recovery of money from a Bank in somewhat similar circumstances. The Bank only proved its assignment. A judgment for the Bank can therefore be meritoriously rested only on that assignment, as putting the Bank ahead of the subrogation rights of the surety, and of the materialmen whose claims were taken over by assignment. I do not think the Assignment of Claims Act had so great an effect.

It is true the Act says: "Notwithstanding any law to the contrary governing the validity of assignments, any assignment pursuant to this paragraph shall constitute a valid assignment for all purposes"; but I think the validity asserted is against all the other laws referred to, and for all purposes for which assignments are usually valid. The primary purpose of the Act was to remove the impediment which the federal statutes had before imposed, and to make it safe and lawful for the United States to pay the assignee without enquiry into the equities of other persons. It was not intended to upset the established doctrines as to the relation of such assignments to the rights of the surety on the Contractor's bond, or those of the laborers and materialmen to be paid out of the proceeds of the job. The retained payments are still to stand as a general security put up for the benefit of all concerned, and dating from the date of the construction contract. The assignment does not alter that. If Contractor and his surety both fail, there is an equity of laborers and materialmen to be paid; and when the surety does not fail, but pays them, there is the conventional subrogation stipulated for in the application for the bond when the surety pays them. I am unwilling to say that this new act puts the Bank who acts under it above and before every one else, no matter what became of the money it loaned to the Contractor.

I would send the case back for findings as to the date of the Contractor's default;

as to whether he then had done any work for which he had not been paid, or whether all the work subsequently paid for was done by the surety; and whether the money which the Bank loaned was diverted from the job, or was really used for the relief of the surety. I think these things would have a bearing on what is right to be done. The Act moreover requires that the Bank give notice of its assignment to the surety, I suppose that the surety may take such precautions against diversions as it may; but this Bank did not give notice for nearly a year, nor until the day before its last loan, and whether the Contractor was already in default does not appear. The surety at once protested the notice and the assignment. This does not seem a fair notice, if the Act is meant to destroy the surety's rights when an assignment is made under it.