**UNITED STATES CASUALTY COM-PANY, Plaintiff,**

v.

**The FIRST NATIONAL BANK OF COLUMBUS, Defendant.**

**Civ. A. 593.**

United States District Court
M. D. Georgia,
Columbus Division.
June 27, 1957.

Powell, Goldstein, Frazer & Murphy, Edward E. Dorsey, Robert E. Coll, Atlanta, Ga., for plaintiff.

Hatcher, Smith & Stubbs, J. Madden Hatcher, Albert W. Stubbs, Columbus, Ga., for defendant.

BOOTLE, District Judge.

T. H. Pearce Company, a contractor, hereinafter called Pearce, entered into a number of construction contracts with the United States Government. Plaintiff, a surety company, executed performance and payment bonds covering these contracts, as required by 40 U.S.C.A. § 270a. Pearce executed, on or about September 1, 1952, a contract bond application and a contractor's agreement of indemnity, under which, in general, it agreed to indemnify plaintiff against any loss or liability incurred by plaintiff under said bonds and assigned, transferred and conveyed to plaintiff all rights in the contracts and all payments and retained percentages due and payable at the time of breach or default in the contracts, or that might thereafter become due and payable.

The earliest dated bond here pertinent was executed October 7, 1952, covering work under Government contract DA-01-076-ENG-1358, which contract was, on April 1, 1953, assigned by Pearce to the defendant bank. Notice of this assignment was given to plaintiff and plaintiff acknowledged said notice, in its acknowledgment reserving all of its "rights, equities or priorities whether by agreement, subrogation or common or statute law." This contract was used by defendant as collateral for a loan to Pearce made August 14, 1953 and paid September 11, 1953. It was in accordance with the intention of both Pearce and the defendant used also as collateral for all other loans made by the defendant bank to Pearce in connection with the performance by Pearce of all of said Government contracts. Pearce had a loan account with defendant bank active from September 3, 1952 to May 21, 1954 involving a number of loans and renewals in substantial amounts. The last new loan was made on December 14, 1953 in the amount of $80,000. This note was renewed several times, the last renewal being on or about May 5, 1954, in the amount of $25,000. On May 12, 1954, Pearce made a payment of $10,000, and on May 14, 1954, a payment of $4,000, leaving a balance of $11,000.

In late 1953, or early 1954, the exact time not being definitely shown by the record in this case, Pearce found himself in financial difficulties and unable to meet his obligations under said contracts, including contract DA-01-076-ENG-1358. Plaintiff, as surety on bonds executed for Pearce, became obligated for completion of the contracts and payment for claims of labor and materials. On May 14, 1954, as further protection for plaintiff in addition to that provided under the bond application and indemnity agreement, a "joint control agreement" was executed by Pearce under which he assigned to plaintiff all payments including retained percentages "to become due under said contracts" meaning the several contracts referred to in said joint control agreement including contract DA-01-076-ENG-1358.

Also, on May 14, 1954, Pearce addressed a letter to defendant, as follows:

"The First National Bank
Columbus, Georgia
"Gentlemen:

"This letter is written to you for the purpose of advising that no funds are to be withdrawn from the account of T. H. Pearce Co., without the signature of T. H. Pearce and in addition thereto that of Edward E. Dorsey or James N. Frazer, whose signatures appear below.

"This instruction is irrevocable and is to remain in full force and effect until Edward E. Dorsey or James N. Frazer advises you in writing to the contrary.

"This letter of instruction is not applicable to those checks listed on a separate sheet attached hereto; the listed checks are to be paid directly upon their receipt.

"Please acknowledge receipt of this request both to the undersigned and to Edward E. Dorsey and James N. Frazer, 1130 Citizens and Southern Bank Building, Atlanta, Georgia.

"T. H. Pearce Company
"By /s/ T. H. Pearce
"President
"/s/ Edward E. Dorsey
Edward E. Dorsey
"/s/ James N. Frazer
James N. Frazer"

Receipt of the above letter was acknowledged by defendant by its letter of May 17, 1954, as follows:

"Mr. Edward E. Dorsey, and
"Mr. James N. Frazer
"1130 Citizens and Southern Bank Bldg.
"Atlanta, Georgia
"Dear Mr. Dorsey and Mr. Frazer:

"We have been advised by Mr. T. H. Pearce, Sr. that either of you is authorized to sign checks with him against the T. H. Pearce Co. and we are not to pay checks on that account unless they bear the signatures of Mr. Pearce and one of you. We will be governed accordingly.

"Yours very truly,
"/s/ W. F. Pearce
"W. F. Pearce
"Vice President"

On May 19, 1954, Mr. James N. Frazer and Mr. Edward E. Dorsey conferred with Mr. H. K. Park and Mr. W. F. Pearce, officers of defendant, at defendant's bank in Columbus, Georgia, and discussed the mechanics of handling the T. H. Pearce Co. account. The record does not disclose what was said at that conference, the plaintiff having stated in answer to defendant's interrogatories that it is unable to set forth the exact statements made by each individual at that conference.

The W. F. Pearce, Vice President of defendant, is not related to T. H. Pearce, President of Pearce. On May 21, 1954, T. H. Pearce, President of Pearce, came into the defendant bank with a Government check payable to Pearce in the amount of $83,748.31. He told W. F. Pearce, Vice President of defendant, that he owed the bank the balance of $11,000 principal, plus interest, which he would like to pay. He asked the bank to deduct the $11,000 plus interest from the Government check and credit the balance to the account of Pearce. The bank carried out his instructions and applied the sum of $11,000 plus interest to pay the balance due on the renewal note of May 5th. The interest item amounted to $51.17.

On August 3, 1954, plaintiff caused to be sent to defendant the following letter:

"First National Bank
"Columbus, Georgia
"Re: T. H. Pearce Co.
"Gentlemen:

"We represent the United States Casualty Company and the New Amsterdam Casualty Company which are the sureties on various perform-

ance and labor and material bonds which T. H. Pearce Co. has given to various agencies of the United States of America.

"We are informed that on or about May 21, 1954, Mr. Pearce paid to you, or there was deducted from his account in your bank $11,000.00, received from a construction job upon which the United States Casualty Company was surety.

"This is to advise you that neither the United States Casualty Company nor the New Amsterdam Casualty Company acquiesce in this payment.

"Mr. Pearce has furnished us with a photostatic copy of a 'Notice of Assignment' dated April 1, 1953, stating that Contract No. DA-01-076-ENG-1358 has been assigned to your bank, and this notice makes reference to a true copy of the instrument of assignment attached thereto; unfortunately, the instrument of assignment was not furnished us. We will appreciate it if you will furnish us with a copy of the assignment for our information.

"Very truly yours,
"Powell, Goldstein, Frazer & Murphy
"By: /s/Edward E. Dorsey
"Edward E. Dorsey"

On or about January 12, 1955, defendant received a Government check in the amount of $49,228.28, payable to defendant as assignee of Pearce representing payment under Government contract No. DA-01-076-ENG-1358, which had been assigned to defendant by Pearce as collateral as aforesaid. On January 12, 1955, defendant endorsed and forwarded this check to plaintiff. The check was received by plaintiff on January 13, 1955, at which time plaintiff wrote defendant as follows:

"Mr. W. F. Pearce, Vice-President
"First National Bank of Columbus
"Columbus, Georgia
"Dear Mr. Pearce:
"This will acknowledge receipt of your letter of January 12, 1955, enclosing check drawn on the Treasury of the United States for $49,228.27 payable to the First National Bank and endorsed by you.

"We appreciate very much your courtesy and cooperation in this matter.

"Very truly yours,
"Powell, Goldstein, Frazer & Murphy
"By: /s/ Edward E. Dorsey
"Edward E. Dorsey"

On October 3, 1955, plaintiff demanded of defendant payment of $11,000 by letter, as follows:

"The First National Bank
"Columbus, Georgia
"Re: T. H. Pearce Co.

"Gentlemen:
"By letter dated May 14, 1954, you were advised that no funds were to be withdrawn from the account of T. H. Pearce Co. without the signature of T. H. Pearce and in addition thereto the signature of Edward E. Dorsey or James N. Frazer. Receipt of these instructions was acknowledged and agreed to by you on May 17, 1954.

"Thereafter, on or about May 21, 1954, a deposit was made to the account of T. H. Pearce Co. from which the bank deducted the sum of $11,000.

"The funds deposited to T. H. Pearce Co. on May 21, 1954 previously had been assigned to United States Casualty Company, and your company was so notified.

"Accordingly, United States Casualty Company hereby demands payment of the $11,000 deducted from this deposit, together with interest thereon from the date of deduction.

"Very truly yours,
"Powell, Goldstein, Frazer & Murphy
"By: /s/ Edward E. Dorsey"

The Government check above mentioned for $83,748.31 represented a payment for work done under contract No.

Y-76277 which was not assigned to defendant, but which was included in the joint control agreement between plaintiff and Pearce dated May 14, 1954, above referred to.

When defendant handled said check for $83,748.31 on May 21, 1954 in the manner above specified it had no notice or knowledge of plaintiff's claimed interest in the proceeds of said check or of Pearce's financial difficulties or default under said Government contracts, if he had then defaulted, other than such notice, if any, as it may be chargeable with by reason of the above mentioned letter of May 14, 1954 and the above mentioned conference of May 19, 1954. Defendant made no inquiry prior to its handling of said check on May 21, 1954 as to the reasons for said letter of May 14, 1954 and, accordingly, received no information as to the reason for such letter.

The entire proceeds of the loan represented by the $25,000 note of May 5th, 1954 were used by Pearce for jobs bonded by plaintiff and therefore plaintiff received direct benefit from this money since it went to lessen or reduce its exposure on its bonds. This appears from Paragraphs 4 and 11 of affidavit of T. H. Pearce, Sr., and is not denied by plaintiff in reply to request for admission No. 2(a) filed by defendant on September 4, 1956, plaintiff's reply to said request being that it does not admit the truth thereof "for the reason that plaintiff is without information or knowledge sufficient to form a belief as to the truth of such statements as set forth therein." Said request was for the admission of the substance of this paragraph.

The work under contract No. DA-01-076-ENG-1358 was completed "sometime in the fall of 1954", (affidavit of T. H. Pearce, Sr., 9th paragraph). While in arguments plaintiff's counsel contend that Pearce defaulted about May 1, 1954, the evidence nowhere fixes the date of such default. The fact of default sufficiently appears from affidavit of C. C. Hartman showing such default and that plaintiff, as a result thereof sustained a net loss of $421,287.11.

The record fails to disclose the date of the $83,748.31 check or the date of the $49,228.28 check and fails to disclose the date of the issuance of said checks. The time of the doing of the work paid for by said checks is not disclosed. Likewise, the evidence fails to disclose whether the latter check represents a progress payment or a final payment of retainage. The bond application for contract No. DA-01-076-ENG-1358 discloses that the contract price was $769,476.00 and "Percentages reserved from payments until completion 10%." Title 41 U.S.C.A. § 54.13, Article 16(b) shows a 10 percent retainage in the standard Government construction contract and provides, however, "that the contracting officer, at any time after 50 percent of the work has been completed, if he finds that satisfactory progress is being made, may make any of the remaining partial payments in full." Ten percent retainage of the contract price as stated would have been $76,947.60 rather than $49,-228.28.

The foregoing facts appear without dispute from the pleadings, interrogatories, admissions, depositions and affidavits on file. The plaintiff and defendant have each filed their respective motions for summary judgment in their favor. The plaintiff sues for the $11,000 plus interest and costs and the defendant, insisting that it owes no part thereof, counterclaims for the $49,228.28 plus interest and costs.

■ Without stating, but bearing in mind, the various contentions and counter-contentions of the parties and the particular facts of this case, we find some principles of law believed to be controlling. This fight is not over funds retained in the hands of the Government, either as 10 percent retainage under the contract or otherwise. The fight is over a portion of a payment made by the Government to Pearce, the contractor, and by Pearce paid over to the defendant bank in payment of a loan, the proceeds of which had gone into one or more of the Government jobs which plaintiff, as surety, was obligated to complete after

Pearce's default. These facts distinguish this case from many cited by the plaintiff and bring this case within the reasoning of a group of cases which prohibit plaintiff's recovery. Judge Sibley, for the 5th Circuit, wrote in Kane v. First Nat. Bank of El Paso, Texas, 1932, 56 F.2d 534, 535, 85 A.L.R. 362, as follows:

"We are not advised of any statute which requires that payments duly made to a contractor for public work be handled by him in any special way, or be given any particular application. No such contractual obligation appears in this case. In the absence of statute or stipulation otherwise the general responsibility of the contractor is credited in contracting with him, and his general resources are drawn on by him in executing the contract. Money or checks paid to him as the work progresses are the property of the contractor unincumbered by any trust, just as are payments to others for goods manufactured or services performed. The contractor's banker may receive such checks and is not bound to see to their application, nor to ascertain the state of the contractor's account with each contract; nor, if he knows it, need he govern himself in any wise with reference thereto. No wrong is done to the contractor's surety in recognizing the contractor's full title to such checks by taking them on deposit with all the consequences ordinarily attaching to such deposit. The cases supposed to establish a trust in favor of the surety are based on Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412. That case did not involve a payment made to the contractor, but involved the reserve kept back by the United States to secure the final performance of the contract for which the surety on the bond had also bound himself. The surety having had to complete the contract claimed this reserve, which was still in the hands of the United States. The Prairie State Bank had only an invalid assignment of it. It was decided that this reserve was a security stipulated in the contract to be held by the creditor for the performance of the obligation, to which the surety became subrogated on performing the obligation just as he would be subrogated to any other security. The case has no application to money not reserved as a security but paid over to the contractor."

Thus, where the money is actually paid out by the contractee to the contractor and by the latter paid over to his bank, the bank may retain the same even though it might know "the state of the contractor's account with each contract", that is to say, the contractor's default. Of course, the bank held no assignment in the Kane case. It was decided 8 years before the October 9th, 1940 amendment to 41 U.S.C.A. § 15, permitting assignments to financial institutions, and, of course, the surety company in the Kane case held no valid assignment just as it can have no valid assignment today.

"An assignment made before 'the issuing of a warrant for the payment thereof' to a surety company, which is neither a bank, trust company, financing institution or Federal lending agency, is still void and was not made valid by the amendment." Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 5 Cir., 1945, 149 F.2d 73(4), 78.

"It (the amendment of 1940) does not except surety companies. The appellant is a surety company, and consequently it has no valid assignment of the proceeds in controversy." General Casualty Co. of America v. Second Nat. Bank of Houston, 5 Cir., 1949, 178 F.2d 679(1), 680.

The Kane case holds that the trust theory contended for there, under the doctrine of Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, can have no application in a case like Kane and like this

one where the fight is over money no longer retained in the hands of the contractee but disbursed by him to the contractor and by the latter deposited in, or paid over to, a bank. The holding of the Prairie State National Bank case, supra, is summarized in its headnote as follows:

"A surety who completes a contract with the United States on the contractor's default is subrogated *to the rights which the United States might assert* against a fund created by the retention of 10 per cent of the sums estimated from time to time as the value of the work done, in order to insure its completion; and this right relates back to the making of the contract, and is superior to any equitable lien asserted by a bank for moneys advanced to the contractor without the surety's knowledge before he began to complete the work." (Emphasis supplied.)

It may be asked what right can the United States assert against a retainage fund after it has voluntarily parted with that fund. This question was asked and answered in two cases from the 9th Circuit, California Bank v. United States Fidelity & Guaranty Co., 1942, 129 F.2d 751 and Bank of Arizona v. National Surety Corporation, 1956, 237 F.2d 90. These cases cite and follow the Kane case and hold that after the Government parts with funds which it could have retained it no longer has any right to retain them and, accordingly, a surety in being subrogated to the rights of the Government is subrogated to nothing. The earlier case points out also that while a surety discharging claims for labor and material is subrogated to the rights of the laborers and materialmen, such rights are against the contractor and not against a bank occupying the position of the defendant in this case.

It will be observed that in the Kane case the bank's victory was not even dependent upon whether or not the proceeds of its loans went into the job. The reasoning of the Kane case is followed in the two Town of River Junction v. Maryland Casualty Company cases, 5 Cir., 1940, 110 F.2d 278, and 1943, 133 F.2d 57. In the first Town of River Junction case the court held that a bank taking an assignment of progress payments before default by contractor, (there is no contention in our case that defendants' assignment of the No. DA-01-076-ENG-1358 contract on April 1st, 1953 was not prior to Pearce's default claimed by plaintiff as of May 1st, 1954), comes ahead of conditional assignment to surety and the bank is entitled to retain money paid to it by the contractee, especially where the bank's loans have gone into the job. In the second Town of River Junction case the court held that where a bank relies on an assignment it has the burden of showing its validity by showing that the contractor was not in default at the time of the assignment inasmuch as the contractor cannot assign what he does not own, the surety having a conditional assignment effective on default, and that the bank relying on an invalid assignment is not a volunteer and is protected to the extent that its loan went into the job. No recovery by a surety was permitted against the bank even though the bank's assignment was invalid. These two cases dealt with a non-federal job and the surety therefore had a valid assignment.

The Coconut Grove Exchange Bank case, supra, stated the rule that where the fight was not over the retained percentages the surety, in order to prevail over a lender bank to whom the funds had been paid, must carry the burden of proving that the money lent by the bank was diverted or used for purposes outside the contract. It so happens that in Coconut Grove Exchange Bank case, supra, the money had been paid over to the bank under a valid assignment but that was not a controlling factor for the court phrased this phase of its inquiry thus: "Whether the Surety Company, irrespective of the effect of said Section 203, (31 U.S.C.A.), as amended, (by the Act of October 9th, 1940), was not required, in order to state and make out a

case for equitable subrogation, to allege and to prove that the funds advanced by the Bank to the Contractor were diverted from purposes essential to the performance of the contract." 149 F.2d at page 76. Then the court answered that question as follows:

"Since the Bank was lawfully in possession of these funds under valid and exclusive assignments, and since the plaintiff sought their recovery, the burden was on it to allege and prove such facts as would establish in it an equitable right of such superior force as to displace the appellant's clear legal right before it could have judgment for the amount of such funds. To this end, perhaps, the Surety asserted that even if it were not entitled to recover by virtue of its assignment, nevertheless, it urged that because it had carried out its own undertaking by the completion of its principal's contract, it was entitled to be equitably subrogated to all of the funds due the Contractor at the time of his default. It insisted that its compliance with the terms of its own covenants as Surety entitles it to prevail over, and to the exclusion of, all parties whose claims do not arise out of sub-contracts or the furnishing of labor and materials used in the performance of the contract. But no superior equity in the Surety will appear unless it shows that the money lent by the Bank was diverted, or used for purposes outside the contract, for if the money lent was applied to the payment of labor and materials used in the contract, thereby discharging obligations for which the Surety would otherwise have been liable, the Surety was in no wise injured by the transaction. It cannot have its liability discharged with the Bank's money and then recover from the Bank money equivalent to that so used for its benefit by its principal. It is fundamental that one seeking in equity to recover money from another must allege and prove injury—not benefit."

Not only does the plaintiff fail to allege or to offer to prove such diversion but it affirmatively appears from the record on these motions that such funds were not diverted. Such fact is made sufficiently to appear, and a countershowing by plaintiff is so completely lacking as to entitle the defendant to a summary judgment. Bruce Construction Corp. v. United States, 5 Cir., 242 F.2d 873.

■ We need not inquire whether the letter of May 14, 1954, the reply thereto of May 17, 1954, and the conference of May 19, 1954 were sufficient to constitute constructive notice to the defendant that the plaintiff was the surety company on Pearce's bonds, or that Pearce was in any financial difficulties, or that it had defaulted, or that plaintiff held a conditional inchoate assignment of funds to become effective upon Pearce's default. Under the above authorities the plaintiff had no valid assignment and the defendant could not be notified as to what did not exist. The defendant stoutly contends that it was not factually or legally put upon inquiry by such a skimpy notice from plaintiff's counsel, which notice concealed more than it revealed, withheld more than it imparted, and, in fact, disclosed nothing except that the two named individuals, apparently having no connection with plaintiff, were authorized and required to sign with Pearce for withdrawals from Pearce's account. We need not explore these contentions since the assignment, even if it had been discovered, was invalid and since the defendant was not bound to "govern himself (itself) in any wise with reference" to its knowledge of "the state of the contractor's account with each contract." Kane v. First Nat. Bank of El Paso, Texas, supra.

The General Casualty Co. of America v. Second Nat. Bank of Houston case, supra, which recognizes the important distinction between the progress payments and the retained percentages also recognizes the importance of ascertain-

ing the status, the whereabouts, of the fund at the inception of the litigation, that is whether the funds are retained percentages or paid out moneys. The court said, 178 F.2d on page 682:

"Under the stipulation of the parties, it was the duty of the court below to decide this case exactly as if the remaining proceeds due upon the contract were *still in the hands of the United States*. This is what it did, so far as we can ascertain from the record. Under its assignments, the bank was entitled to the full amount of progress payments due the contractor immediately prior to the latter's default, not to exceed the amount of indebtedness due the bank. *The surety was entitled to demand that the sum of the retained percentages withheld by the owner* be applied to debts due for labor and material, which the contractor had failed to pay, but there is nothing in the record to indicate that this amount or any portion thereof is a component part of the funds in controversy." (Emphasis supplied.)

█ Inasmuch as plaintiff's assignment, even if not invalid as in contravention of 41 U.S.C.A. § 15, is effective only upon Pearce's default and there being no showing that such default occurred before the defendant's deduction of the $11,000 from the large check on or about May 21st, 1954 in no event could plaintiff's motion for summary judgment be granted under the assignment theory, and, under the foregoing authorities, it could not be granted under the subrogation theory advanced.

A case in which the surety prevailed over the bank is Pacific Indemnity Company v. Grand Ave. State Bank of Dallas, 5 Cir., 1955, 223 F.2d 513, and it distinguishes itself. The court said on page 517:

"The basic facts involved here, the facts upon which the ultimate decision depends, are these: appellant's rights to the proceeds of the contract matured through the contractor's default prior to the latter's receipt of the check; the contractor's debts to the Bank were created prior to the former's default, were secured by valid chattel mortgages and, insofar as this record indicates, *were not connected with Sharrock's operations under the contract; prior to the offset*, without having extended any additional credit to the contractor, the *Bank learned of Sharrock's default* and of *appellant's restraining order* against Sharrock's expenditure of any of the contract payments." (Emphasis supplied.)

While in our case we are perhaps not concerned with the right of offset inasmuch as no deposit of the $11,000.00 was made and it was handled by the bank as directed by Pearce, the following discussion in the Pacific Indemnity Company v. Grand Ave. State Bank of Dallas case, supra, is apropos and enlightening.

"Our study of the cases convinces us that the problem must be resolved in the light of circumstances shown to exist when the offset was made, not when the deposit was received by the bank. Although the facts differ and there are expressions relating to the legal issues argued by these parties, the opinions in the cases cited by appellant, as well as those relied upon by the trial court and the Bank, clearly indicate to us that the courts of Texas approach such cases from the point of view of *balancing the equities* between the bank and the equitable owner of the fund, rather than analyzing the precise legal relationships between the parties. When the evidence does not clearly reflect the maturity of the equitable claim, or *when the debt to the bank was incurred in a manner which gives it a similar equitable claim to the fund, the right of offset is recognized and the bank prevails*. However, when the evidence clearly shows that the bank knew or should have known of the existence of the equitable claim, and when the debt owed to the bank *has no connection with the fund in dispute*, the bank is

required to recognize the equitable ownership of the fund and may not pay itself or otherwise handle the account to the detriment of the equitable owner." (Emphasis supplied.)

Thus it follows that the defendant was entitled to receive and retain the $11,000 plus interest, particularly in view of the fact that the proceeds of its loan were not diverted but went into the bonded jobs. But even if such were not the law applicable to this case nonetheless the defendant would be entitled to prevail as against plaintiff's demands inasmuch as the defendant was entitled to reimburse itself out of the $49,228.28 check it received on or about January 12, 1955. If the defendant erroneously withheld from the plaintiff $11,000.00 from May 21, 1954 until January 12, 1955 and then, on the latter date, remitted to plaintiff $11,-000 plus interest thereon between said dates which defendant was entitled to retain in liquidation of Pearce's indebtedness, thought to have been paid by the deduction on May 21, 1954 but actually not paid, then the defendant has righted its own wrong against plaintiff and plaintiff cannot complain.

██ The contract No. DA-01-076-ENG-1358 was validly assigned to the defendant, and held by defendant as security for all loans made by it to Pearce in connection with these Government contracts. The check for $49,228.28 was in part payment for work under said assigned contract. I see nothing to impair the defendant's right to receive that check and apply its proceeds as far as need be toward liquidating the debt it secured save possibly the uncertainty as to whether that check represented a progress payment or a percentage which should have been retained. Under the Kane case and those which follow it, I see no burden on the defendant to inquire into the contractor's accounts with the contractee. If said check actually represented funds which should have been retained and if plaintiff had any equitable rights to insist that such funds be so retained, as it probably did have, see General Casualty Co. of America v.

Second Nat. Bank of Houston, supra, and Pacific Indemnity Company v. Grand Ave. State Bank of Dallas, supra, plaintiff should have taken whatever steps were available to it, by injunction or otherwise, to require such retention, as, for instance, equitable proceedings against the contractor to enjoin it from receiving or dissipating the check as were taken in Pacific Indemnity Company v. Grand Ave. State Bank of Dallas, supra. This check was not received by defendant until on or about January 12, 1955. The plaintiff contends that Pearce defaulted about May 1st, 1954. Presumably, plaintiff had full knowledge of Pearce's accounts and defendant did not.

Counsel for defendant may prepare and submit a summary judgment in its favor taxing costs against plaintiff and submitting a copy to counsel for the plaintiff who shall have five days for suggestions as to form.