## GENERAL CASUALTY CO. OF AMERICA v. SECOND NAT. BANK OF HOUSTON.

### No. 12734.

United States Court of Appeals
Fifth Circuit.

Dec. 29, 1949.

Rehearing Denied Jan. 27, 1950.

---

Allen Wight, Dallas, Texas, for appellant.

Baine P. Kerr, Houston, Texas, J. C. Hutcheson, III, Houston, Texas, for appellee.

Before HOLMES, McCORD and WALLER, Circuit Judges.

HOLMES, Circuit Judge.

This is an action under the Declaratory Judgments Act, as amended, to declare the rights and legal relations of the parties with reference to their respective claims against the United States, and their several rights to the proceeds of government contracts, which are now held in trust. Section 274(d) of Judicial Code, as amended, 28 U.S.C.A. § 400, now Sections 2201 and 2202 of new Judicial Code, new Title 28 U.S.C.A.

The appellant was surety on the payment and performance bonds of a government contractor, who defaulted on his contracts. The Government terminated the same, and contracted with others to finish the work, which they did. The appellant was required under its bonds to pay, and did pay, laborers and materialmen certain sums of money for which it claims reimbursement. The appellee is a banking

**680**

corporation whose predecessor, Guardian Trust Company (also a banking corporation), loaned money to the contractor to pay for labor and materials used in the performance of such contracts. The controversy between appellant and appellee is as to which one of them is entitled to the sum of $39,503.53, which represents what was owing by the Government on final settlement under two of said contracts.

The facts in the main were stipulated. In addition to the stipulation, some evidence was taken, both oral and documentary, which is in the record. The court below found from the weight of the evidence that all of the money loaned to the contractor by appellee's assignor went into these jobs, and concluded as a matter of law that the decision of this case was governed by the rule laid down in Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 5 Cir., 149 F.2d 73. Accordingly, it declared and adjudged that the assignments of appellee were superior to the rights or claims asserted by the appellant, and ordered that the entire funds held in trust be applied to the payments due on the notes held by the appellee, which were secured by said assignments.

■ We think that the assignments to the bank are the only valid assignments in this record. All notices of such assignments were duly given to all persons, officers, agencies, and departments, to whom or to which notice was required by law, including notice to the appellant as surety on the bonds of the contractor. Section 203 of Title 31 U.S.C.A., subject to several provisos, expressly excepts a bank, trust company, or other financing institution, from the prohibition against assignments of certain claims against the United States. It does not except surety companies. The appellant is a surety company, and consequently it has no valid assignment of the proceeds in controversy. Whatever rights it may have arise solely from the payment by it of some of the claims covered by its surety bonds.

■ The original heading of the 1940 amendment of the federal anti-assignment act was as follows: "To assist in the national-defense program by amending sections 3477 and 3737 of the Revised Statutes to permit the assignment of claims under public contracts." 54 Stat. 1029. The evident purpose of the legislation was to make it possible for contractors to pledge to a bank, as collateral security, their claims against the Government in order to enable them to borrow money to do the work required by the contract. Page 12,557, Part II, Vol. 86, Cong.Record; 31 U.S.C.A. § 203, as amended. See also: Prairie State Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L. Ed. 412; Martin v. National Surety Co., 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822; Kane v. First National Bank, 5 Cir., 56 F.2d 534, 85 A.L.R. 362; Third National Bank of Miami v. Detroit Fidelity and Surety Co., 5 Cir., 65 F.2d 548; Town of River Junction v. Maryland Casualty Co., 5 Cir., 110 F.2d 278; Id., 5 Cir., 133 F.2d 57; Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 5 Cir., 149 F.2d 73.

There is an important distinction between the progress payments due the contractor at the time of the latter's default and the retained percentages then held by the United States as security for performance of the contractor's obligations to the owner. The contractor, prior to default, had the right to assign to the bank (as it did) the progress payments due it. There was no lien attached to such funds, and the payment of them to the contractor or his assignee (to the extent permissible under the anti-assignment statute) was within the scheme of the building contract; but the ten per cent retained each month under the contract was held by the owner for the protection of itself and the surety. In these retained percentages, the contractor could give no one a right superior to that of the owner and the surety. This principle was established in Prairie State Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412. It has been followed in a number of decisions by this court, outstanding among which is Town of River Junction v. Maryland Casualty Company, 5 Cir., 110 F.2d 278. While that case did not involve a claim against the

United States, any distinction for that reason is without force here, because of the 1940 amendment to the anti-assignment act. What was said in that case as to the contractor's right of assignment is equally applicable here: "It being the assignment of an already existing obligation, and of the whole of it, it is a legal rather than an equitable assignment, though the latter would be equally good when supported as here by a present valuable consideration. Notice of it was duly given to the Town, which acquiesced. The Bank's right to receive the money became fixed, and it should have been paid by July 15. It was no longer due to the contractor. His default thereafter could not undo the assignment." 110 F.2d p. 281.

We have also given full effect to the stipulation of the parties for proceeds of the contract remaining after completion of the work to be deposited with the appellee's predecessor without prejudice to the rights of claimants, and with the same result as if said proceeds remained in the hands of the Government. Under the stipulation, it was agreed that this amount was to be held in trust, and finally paid to the appellant and appellee in accordance with their respective rights, as revealed by an accounting between them. This stipulation is in part as follows, p. 40 and 41: "In other words, Trust Company and Surety Company are each claiming that they were, and are now, entitled to all of said remaining proceeds of said contract at the time of default of Contractor and none of their acts as hereinabove set out shall injuriously affect or prejudice, in any way, the claims which they had at that time or do now or hereafter have to said remaining proceeds of said contract approximating Sixty-Three Thousand Dollars ($63,000). Pursuant to such understanding, it is now specifically agreed that if any of said remaining proceeds of said contract as they existed on said date have been or during the existence of this agreement may be improperly expended to the prejudice of one of the parties and to the benefit or advantage of the other party—excepting only said approximately Three Thousand Dollars ($3,000) for Christmas payroll and incidental expenses—then, to the extent of the injury to such other party, the party receiving the advantage thereof shall be obliged and be under legal obligation to reimburse the remaining proceeds of said contract or pay direct to the other party the damages occasioned thereby; that is to say, any party who has benefited by any improper payment will either reimburse said remaining proceeds of said contract or the other party therefor, the result being that said other party will have the same rights and protection as if the remaining proceeds of said contract on hand at the time this agreement became effective had not been improperly depleted in any way."

The author of the opinion in the Town of River Junction case dissented in the Coconut Grove case, 149 F.2d 73, because he thought it did not appear that any part of the work for which payment was made was done by the contractor before his default. We do not have that question here, because of the finding of the court below that all of the money loaned by appellee went into the jobs before default, nor do we have here any of the other questions that actuated the dissent in the Coconut Grove case, such as the absence of a fair notice to the surety and the absence of findings as to whether the money was diverted. Both as to the retained percentages and as to the right of the contractor to assign accrued progress payments, the *River Junction* and *Coconut Grove* cases are indistinguishable from this one, since in both there were no statutory prohibitions against the rights of assignees.

In the first *River Junction* case, the author of the opinion propounded two questions, as follows: May the contractor arrange with his bank for cash needed for payrolls by assigning a particular progress payment already earned, to save the work from stopping until payment shall be made? Will the assignment, acquiesced in by the owner, hold good against the surety if the contractor defaults in a later month? Answering these questions, the court said: "If the answer is no, banks cannot safely lend. Laborers must wait or quit. Contractors must more often fail, and sureties be more often called in, with added delay

and expense to the work. The whole matter of public contracts will be seriously affected. If the answer is yes, the work and the workers will be facilitated and no one injured. The surety cannot object on the ground that the contractor might divert the money, for he has agreed to trust the contractor until he defaults. In the present case the surety got the full benefit of the arrangement, and if his permission had been asked in advance we cannot doubt it would have been given."

To the above we need to add only that in the present case the arrangement was submitted to the surety by the bank's letter, which concluded by saying: "If this arrangement is not satisfactory, please advise so that, in the future, we can work out some plan which will be satisfactory." To this letter there was no reply.

Under the stipulation of the parties, it was the duty of the court below to decide this case exactly as if the remaining proceeds due upon the contract were still in the hands of the United States. This is what it did, so far as we can ascertain from the record. Under its assignments, the bank was entitled to the full amount of progress payments due the contractor immediately prior to the latter's default, not to exceed the amount of indebtedness due the bank. The surety was entitled to demand that the sum of the retained percentages withheld by the owner be applied to debts due for labor and material, which the contractor had failed to pay, but there is nothing in the record to indicate that this amount or any portion thereof is a component part of the funds in controversy. The United States was entitled to use the balance of the contract price, including these funds, to complete the contract,

which it did; and, after taking care of the Christmas payroll, the amount remaining in the hands of the Government was $39,503.-53, which is insufficient to pay the bank's indebtedness and to reimburse the surety for its involuntary payments to laborers and materialmen. Each of the parties hereto is claiming the entire amount.

We have not been pointed to any place in the record that gives the aggregate amount of the retained percentages when the contractor defaulted. The surety at that time did not demand that the retained percentages be applied to debts for labor and material, which the contractor had failed to pay; but it cooperated with the Government and appellee in arranging for the completion of the work, the cost being paid by the owner out of the retained percentages and other amounts to become due on completion of the jobs. The appellant advanced none of the funds necessary to complete the contracts, and the appellee refused to make further advances thereon. These facts were alleged in the responsive pleading of the appellee, and were not denied by appellant. The latter states in its brief that the nature of the funds, whether progress payments or retained percentages, is of no importance; and that it is not necessary to the result of this case to make any distinction between them. We accept this view, since it is agreeable to both sides and since neither in the pleadings, the evidence, nor the stipulation is there anything to contradict the plea of the appellee that the Government has expended the entire retained percentages in defraying the cost of completing the jobs.

We find no reversible error in the record, and the judgment appealed from is

Affirmed.