The **NATIONAL SHAWMUT BANK OF BOSTON**, Plaintiff, Appellant,

v.

**NEW AMSTERDAM CASUALTY CO.,** Inc., Defendant, Appellee.

No. 7260.

United States Court of Appeals
First Circuit.

May 5, 1969.

Rehearing Denied June 10, 1969.

W. Bradley Ryan, Boston, Mass., with whom Morris I. Bearak, Newton, Mass., Milton Bordwin and Guterman, Horvitz & Rubin, Boston, Mass., were on brief, for appellant.

Samuel H. Cohen, Boston, Mass., with whom Avram G. Hammer, Boston, Mass., was on brief, for appellee.

R. Robert Popeo, Haskell Cohn, Laurence R. Buxbaum and Mintz, Levin,

Cohn & Glovsky, Boston, Mass., on brief for First Nat. Bank of Boston, amicus curiae.

G. Stanley Lowden, Michael Glazerman and Peabody & Arnold, Boston, Mass., on brief for Hartford Acc. & Indem. Co., amicus curiae.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

In the summer of 1962, Anderson Bros., Inc., a general contractor, entered into three construction contracts with the United States Air Force for work at Otis Air Force Base in Massachusetts and Dow Air Force Base in Maine. As required by the Miller Act, 40 U.S.C. § 270a et seq., Anderson Bros., Inc. applied to the appellee (surety) for payment and performance bonds. Contained in the application for the bonds was an assignment to the surety " * * * of earned monies that may be due or become due under said contract * * *." This assignment to the surety was not recorded under the Uniform Commercial Code.

Subsequent to the posting of payment and performance bonds on two contracts, Anderson Bros., Inc. obtained a line of credit from appellant National Shawmut Bank (the Bank).[1] As collateral for the loans an assignment of " * * * all monies due and which shall hereafter become due from the United States * *." was made to the Bank. A financing statement covering this assignment was filed in compliance with M.G.L.A. c. 106-9, and notice of the assignment was given to the United States as required by the Assignment of Claims Act, 31 U.S.C. § 203 (1964). However, no written notice was given to the surety even though such notice was required by this Act.

In the spring of 1963 the construction contracts were terminated by the United States because of Anderson's default. The surety completed the work as it was obligated to do under the bonds. The cost of completion was approximately $97,000.

As of the date of termination of the contracts, earned progress payments totaled $44,202.05. Both the surety and the Bank seek to satisfy their respective claims from this fund.

In December of 1964 a complaint was filed by the Bank naming the surety as defendant in the District Court for the District of Massachusetts. The case was tried to the court without a jury and on September 27, 1968, the district court dismissed the complaint and ordered judgment for the defendant surety. The Bank brings this appeal.[2]

The critical question which this appeal raises is one which has been, and continues to be, the cause of some uncertainty in the wake of enactment of Article 9 of the Uniform Commercial Code (U.C.C.). It is: to what extent, if any, does the doctrine of subrogation survive the passage of Article 9 of the U.C.C.?

Our effort will be to see what subrogation means in the transaction before us, to see what extent Article 9 is devised to deal with such a transaction, and to apply relevant case law. Subrogation is an old term, rooted in equity, and semantically stemming from words meaning "ask under". Today we use the parallel phrase, "stand in the shoes of". The equitable principle is that when one, pursuant to obligation—not a volunteer, fulfills the duties of another, he is entitled to assert the rights of that other against third persons.

In this case there is confusion because the tendency is to think of the surety on

1. Between October 19, 1962, and January 9, 1963, the bank made loans to Anderson Bros., Inc. totaling $63,260 of which there remains $37,477 outstanding and unpaid.

2. In view of our disposition of this appeal, we need not, and do not, pass on the question of the effect of the Bank's failure to give notice of its assignment to the surety as required by the Assignment of Claims Act, 31 U.S.C. § 203 (1964).

Miller Act payment and performance bonds as standing in the shoes only of the entity it "insures"—the contractor. So long as this one-dimensional concept prevails, logic compels the surety to be assessed as merely one of the contractor's creditors, and to be subject to the system of priorities rationalized by the Uniform Commercial Code. But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety—who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

This unique accumulation of subrogation rights serves to induce a function that is neither ordinary insurance nor ordinary financing. The business of a construction contract surety is not one of ordinary insurance, for the risk is not actuarially linked to premiums, nor is there a pooling of risks. Pearlman v. Reliance Ins. Co., 371 U.S. 132, 140 n. 19, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). Neither is the business one of ordinary financing, for while the surety extends its credit to the owner (the government), as the ultimate guarantee that the job will be done, this is a credit that may either never have to be drawn upon or, if it is drawn upon at all, will in all likelihood be overdrawn. That is, if a contractor defaults, "payment" of the credit depends upon the surety's competence in economically finishing what somebody else has started. In this hermaphroditic situation, the "security" for the surety is not the fee but a compound of its confidence in the contractor and the opportunity to prevent or minimize its ultimate loss by its right to salvage the

debacle by its own performance. Assuming that its confidence is misplaced, the surety receives very little from the contractor but the right to complete the job. Unlike a bank, it does not face specific requests for funds which it is able to link to suitable collateral with subsequent requests determined by assessment of current management and currently available additional security. In case of default, the bank takes its security; the surety must go ahead and perform.

All of this, we think, is relevant background to an interpretation of the Uniform Commercial Code as applied to the kind of security interest at issue. We commence by saying that appellant makes a respectable argument based on the Code. At best, however, we deem the Code not compelling and, on balance, not focused or directed to the surety's problem.[3] To begin with, we have the exculpatory general principle that "Unless displaced by the particular provisions of this chapter, the principles of law and equity * * * shall supplement its provisions." M.G.L.A. § 1–103. As we shall see, the Massachusetts Supreme Judicial Court gives impressive weight to this canon in French Lumber Co., Inc. v. Commercial Realty & Finance Co., Inc., 346 Mass. 716, 719, 195 N.E. 507 (1964).

Going on to specifics, we note the definition of "security interest" in M.G. L.A. § 1–201(37) as "an interest in personal property or fixtures which secures payment or performance of an obligation * * * [and which] includes any interest of a buyer of accounts * * * or contract rights * * *." Neither clause seems to fit the construction contract surety. What secures its payment is really the opportunity, on default, to finish the job and apply any available funds against its cost of completion. This kind of right does not readily set-

---

3. We recognize that some law review notes advocate literal application to the surety's interest. See, e. g., Comment, 6 B.C. Ind. & Comm.L.R. 798 (1965); Note, 4 B.C.Ind. & Comm.L.R. 752 (1963); Note, 69 Dickinson L.R. 172 (1965); Note, 65 Col.L.Rev. 927 (1965). But we are not, as we indicate, infra, impressed by their argument.

tle under the rubric of "personal property" or "fixtures". Nor does the surety easily fit the description of a "buyer of * * * contract rights". We make a similar comment about M.G.L.A. § 9–102(1) (a) which applies the Code "to any transaction * * * which is intended to create a security interest in personal property or fixtures including * * * contract rights; and * * * (b) to any sale of * * * contract rights". While one may strain to say that the right to finish a job in an emergency and thus minimize damages is a contract right, we think it is not the kind of independently valuable asset that such synonyms as "goods, documents, instruments, general intangibles, [and] chattel paper" suggest.

There are other hurdles. Section 9–102(2) requires "security interests" to be "created by contract". In this case the real security is not the assignment of accounts receivable—which could be, failing the completion of performance, set off by the government—but the eventual right to be in the shoes of the government upon job completion. This is not "created by contract" but rather by the status, resulting from a contract, inhering in a surety, quite independently of the expressed terms of the contract. *See* Memphis & L. R. R. Co. v. Dow, 120 U.S. 287, 301–302, 7 S.Ct. 482, 30 L.Ed. 595 (1887).

We add to this our difficulties with § 9–106 which defines "[a]ccount" as "any right to payment * * * not evidenced by an instrument" and "[c]ontract right" as "any right to payment under a contract not yet earned by performance". As to the former, when the contractor defaults, there is no right to payment, *see infra*. As to the latter, we think of a right to receive payments from one who continues with the performance (as rents receivable by a landlord), rather than a right conditioned on performance by the transferee of the "right".

We have, finally, the historic fact of the rejection of a proposed § 9–312(7) to the Code which would have provided that "A security interest which secures an obligation to reimburse a surety * * * secondarily obligated to complete performance is subordinate to" a later lender which perfects its security interest. We report the comments of the Editorial Board in the margin.[4] Contrary to appellant's argument, we do not feel that this signalized an admission by surety companies that theirs was a "security interest" within the meaning of the Code, but simply that they had won the battle to defend the preserve of subrogation. The cases cited by the Board would seem to underscore this conclusion.

4. "The Surety Companies' representatives convincingly took the position that subsection (7) as it stands is a complete reversal of the case law not only of the Supreme Court of the United States but also of the highest courts of most of the states. They cited Prairie State National Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); Henningsen v. U. S. F. & G., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); United States v. Munsey Trust, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) at 240; 9 Am.Jur. 72, §§ 114, 115; 43 Am. Jur. 939, § 197 et seq.; 60 C.J. Subrogation § 87; Stearns Law of Suretyship, 5th Ed. (1951), Page 472; Appeal of Lancaster County Natl. Bk., 304 Pa. 437, 155 A. 859 (1931); and 127 A.L.R. 974, 976. . . .

"Under the cited case law, the surety's rights come first as to the funds owing by the owner unless the surety has subordinated its right to the bank. Subsection (7) of the Code as written would reverse the situation and give the bank priority in all cases.

"Under existing case law, both the contractor and the bank are in a position to bargain with the surety which may or may not be willing to subordinate its claim. Under subsection (7) as written in the Code the surety company would have nothing to bargain about." Uniform Laws Annotated, Uniform Commercial Code, Official Draft, Text and Comments, at 773, 777 (1952); Uniform Laws Annotated, Uniform Commercial Code, Changes in Text and Comments, at 25–26 (1953).

If analysis were not enough, we think that case law is. Perhaps the most significant case, not cited by appellant or its amicus is French Lumber Co., Inc. v. Commercial Realty & Finance Co., Inc., 346 Mass. 716, 195 N.E.2d 507 (1964). For we deem our source of substantive law as governed by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and there has been no suggestion that this is a proper case for the devising of a rule of federal common law. In that case the lumber company financed the purchase of an automobile through Ware Trust Company (Ware) which filed a financing statement under the U.C.C. The lumber company then pledged its equity in the automobile to Commercial Realty which also filed a financing statement under the U.C.C. The lumber company defaulted on its obligations and Ware sought to foreclose on its note. However, the lumber company was able to refinance its obligation through Associates Discount Corporation (Associates) which gave a note for amounts due to Ware in exchange for cancellation of its security interest. The lumber company defaulted again and Associates repossessed the automobile and sold it at public auction. Commercial Realty claimed the proceeds of the sale by virtue of its recorded security interest. Of course, Associates would have had a priority if it could have succeeded to Ware's security interest which it could have done through assignment. However, no assignment was made.

Nevertheless, the Massachusetts Supreme Judicial Court held that Associates prevailed by virtue of its subrogation to the rights of Ware. In reaching this conclusion the court remarked: "No provision of the Code (U.C.C.) purports to affect the fundamental equitable doctrine of subrogation." 346 Mass. at 719, 195 N.E.2d at 510.

Appellant's effort at argument to distinguish French on its facts does not persuade us that the Massachusetts court would take any different view here of the non-displacement of equitable subrogation by the Code.[5] Appellant argues that the surety in the case before us, could have perfected a filing under § 9-312. But in French the refinancing party could similarly have taken an assignment of a prior recorded security interest. That it did not do so did not affect its rights as a subrogee.[6]

Finally, the Bank asserts that even if the surety may claim as a subrogee, the Bank has a superior claim in equity. This is so, according to the Bank, where earned progress payments are involved and where the surety has benefitted from the contractor's application of the loan proceeds to contracts bonded by the surety.

The position espoused by the Bank originated in cases where earned prog-

5. It is true that in *French Lumber* Ware had filed a financing statement under the U.C.C., and therefore, all subsequent lienors were on notice of the existence of a prior security interest. This, however, does not aid the bank in distinguishing *French Lumber*, for here the bank knew of the existence of the surety. And even if the bank had no actual notice, it might well be held, at least in a Miller Act case, to constructive notice of the surety's existence. *See* Moran v. Guardian Casualty Co., 64 App.D.C. 188, 76 F.2d 438 (D.C. Cir. 1935).

6. Appellant's only case authorities for the displacement of subrogation by the Code are United States v. G. P. Fleetwood and Co., 165 F.Supp. 723 (W.D.Pa.1958), and Hartford Accident & Indemnity Co. v.

State Public School Building Authority, 26 Pa.Dist. & Co.R.2d 717 (1961). The authority of both cases as a statement of Pennsylvania law is, we think, negated by Jacobs v. Northeastern Corporation, 416 Pa. 417, 206 A.2d 49, 11 A.L.R.3d 1220 (1965), which states that "Rights of subrogation, although growing out of a contractual setting and ofttimes articulated by the contract, do not depend for their existence on a grant in the contract, but are created by law to avoid injustice. Therefore, subrogation rights are not 'security interests' within the meaning of Article 9." 206 A.2d at 55. While *Jacobs* involved the surety's rights to retainages and *Fleetwood* involved unpaid progress payments, we do not see this difference as having any bearing on the surety's rights, *see infra*.

ress payments had been paid to an assignee bank and the surety was attempting, after the default of the contractor, to recover the amounts paid. *See, e. g.,* American Fidelity Co. v. National City Bank of Evansville, 266 F.2d 910 (D.C. Cir. 1959); Coconut Grove Exchange Bank v. New Amsterdam Casualty Co., 149 F.2d 73 (5th Cir. 1945); Town of River Junction v. Maryland Casualty Co., 110 F.2d 278 (5th Cir. 1940); National Union Fire Ins. Co. of Pittsburgh v. United States, 304 F.2d 465, 157 Ct.Cl. 696 (1962).[7]

Here the payments were earned but unpaid prior to the contractor's default. Prior to default, the contractor had the right to assign progress payments and had the Bank received payment, it could not (absent circumstances amounting to fraud) have been divested by the surety. But upon default, the surety which is obligated to complete the work steps into the shoes of the government—not of the contractor which on default has forfeited its rights. It is subrogated not only to the right of the government to pay laborers and materialmen from funds retained out of progress payments, Prairie State Nat. Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Pearlman v. Reliance Ins. Co., *supra,* but also to the government's right to apply to the cost of completion the earned but unpaid progress payments in its hands at the time of default. United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); Trinity Universal Ins. Co. v. United States, 382 F.2d 317, 320 (5th Cir. 1967). The Massachusetts Supreme Judicial Court has specifically recognized that a mere assignee of a contractor, such as appellant here, receives the right to moneys due the latter subject, however, to the dominant right of the owner to recoup the damages suffered by default. American Bridge Co. of New York v. City of Boston, 202 Mass. 374 (1909).[8]

That this right of a completing surety to earned but unpaid progress payments is generally recognized is indicated by the authorities noted in the margin.[9]

While appellant has cited many cases where a bank was allowed to retain progress payments made to it, which we have noted *supra,* its only authority for the proposition that a bank has priority over a surety with regard to earned but unpaid progress payments is General Casualty Co. v. Second National Bank of Houston, 178 F.2d 679 (5th Cir. 1949). Any distinction between the surety's rights to retainage and those to unpaid progress payments, however, was eliminated by the later Fifth Circuit case of Trinity Universal Insurance Co. v. United States, 382 F.2d 317 (5th Cir. 1967).

Our analysis has centered on the interpretation of the Code and of the doctrine

---

7. In National Union Fire Ins. Co., *supra,* the fund in question consisted of a payment which had been earned, and for which a check had been issued, prior to default. The surety obtained a state-court order restraining the bank from cashing the check, but at the time the restraining order was obtained, there had been no default and the surety had not performed. Clearly, the court treated the payment as though it actually had been made.

8. It was suggested by the amicus bank that, since the government had no right to withhold payment until default, the surety had no rights to the earned but unpaid progress payments at the time of default. This ignores the fact that what the surety succeeded to was the government's right to recoup after default.

9. Trinity Universal Ins. Co. v. United States, 382 F.2d 317 (5th Cir. 1967); American Fidelity Co. v. National City Bank of Evansville, *supra;* Moran v. Guardian Casualty Co., 76 F.2d 438 (D.C. Cir. 1935); Fidelity & Deposit Co. of Md. v. United States, 393 F.2d 834 (Ct. Cl.1968); National Surety Corp. v. United States, 133 F.Supp. 381, 132 Ct.Cl. 724 (1955); Royal Indemnity Co. v. United States, 93 F.Supp. 891, 117 Ct.Cl. 736 (1950); Modern Industrial Bank v. United States, 101 Ct.Cl. 808 (1944); Hardin County Sav. Bank v. United States, 106 Ct.Cl. 577, 65 F.Supp. 1017 (1946).

of subrogation as developed by the cases. We have found no basis for injecting other general equitable or policy considerations. We are unmoved by the claims of either the Bank or the surety to inherently superior status. The Bank loan undoubtedly helped minimize the surety's cost of completion. But completion by the surety was necessary to preserve the fund which is here in issue. The surety could concededly have avoided this litigation by perfecting its filing, but so could the Bank by making inquiry of the arrangements between contractor and surety. It may well be—although we express no opinion—that to subject sureties to the filing requirements of the Code would improve and rationalize the system of financing public contracts. But equitable subrogation is too hardy a plant to be uprooted by a Code which speaks around but not to the issue.

Affirmed.

On Petition for Rehearing

**PER CURIAM.**

The National Shawmut Bank brings this petition asking that we reconsider our earlier decision holding that a surety's right of subrogation is not displaced by Article 9 of the Uniform Commercial Code. Petitioner's argument is directed at the validity of our interpretation of the decision of the Massachusetts Supreme Judicial Court in French Lumber Co., Inc. v. Commercial Realty & Finance Co., Inc., 346 Mass. 716, 195 N.E.2d 507 (1964).*

Petitioner raises several points which we consider hereafter only to the extent that our opinion does not reflect them. Before, however, proceeding to a discussion of petitioner's specific arguments, we note that while French Lumber as an expression of Massachusetts law is central to our holding, it is not inconsistent with existing authority on this issue. But even if it were, we must reject petitioner's attempt to inter French Lumber by examining the briefs and discovering that the court's statement was not based on any contention advanced therein.

Petitioner's first argument is that whereas here subrogation is a substitute for a security interest, in French Lumber subrogation was employed as an adjunct of general equity principles. This purported distinction is in fact a comparison of the two entirely separate concepts of function and rationale. In both cases subrogation served as a substitute for a security interest, and in both cases the substitution is justified by the invocation of general equity principles. Indeed, subrogation is a creature of equity, and therefore always arises as an adjunct of equitable principles.

Petitioner's second argument is that since all three lenders in French Lumber had recorded their security interests under the Code, that case involved subrogation within the Code. The important point is, however, that but for subrogation the third lender would have been subordinated to the second lender. In French Lumber subrogation was used to override the priorities of the Code—possibly exerting more force than here where, arguably at least, the surety's interests are not covered by Article 9 of the Code.

Finally, petitioner asserts that the third lender in French Lumber was a "volunteer" and not entitled to subrogation rights. The general rule is that a mere volunteer is not entitled to subrogation. That fact would not, of course, bar the Massachusetts Supreme Judicial Court from holding otherwise. But, in fact, the third lender does not fall under the volunteer doctrine, which refers to

---

* We discuss the argument without much enthusiasm for petitioner's attempt to comply with our rule 6 by saying that it did not foresee the weight we would assign to that case, not relied upon by the district court. Whether selected for citation by that court or not, the unqualified language of French that "No provision of the Code (U.C.C.) purports to affect the fundamental equitable doctrine of subrogation" posed an obvious problem for petitioner, then the appellant.

**850**

gratuitous or quasi-contractual undertakings. The third lender's rights, as did the surety's here, arose because of its contractual obligations.

Petition for rehearing denied.