**In re KUHN CONSTRUCTION COMPANY, INC., Debtor.**

**Bankruptcy No. 80–20174.**

United States Bankruptcy Court,
S. D. West Virginia.

April 10, 1981.

Susan Cannon-Ryan and Chester Lovett, Charleston, W. Va., for Kuhn Const. Co., Inc., debtor.

Thomas B. Bennett, Charleston, W. Va., for and member of Creditors' Committee.

Michael T. Chaney, Charleston, W. Va., for Buckeye Union Ins. Co.

## MEMORANDUM OF OPINION

EDWIN F. FLOWERS, Bankruptcy Judge.

Buckeye Union Insurance Company [Buckeye] seeks an order, pursuant to 11 U.S.C. § 363(c), prohibiting the Debtor, Kuhn Construction Company [Kuhn], from using cash collateral. In addition, Buckeye asks that the Debtor be required to segregate the cash collateral and to replace cash collateral previously spent by it. Conversely, both Kuhn and its chapter 11 Creditors' Committee assert, in opposition to Buckeye's motion, that Buckeye has no security interest in the funds for which it now seeks protection.

11 U.S.C. § 363(a) defines the term cash collateral as including "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest." Section 363(c)(2) of the Bankruptcy Code prohibits the debtor's use of cash collateral unless

"the entity that has an interest in such cash collateral consents" or the court, after notice and hearing, authorizes use of the collateral. 11 U.S.C. § 363(c)(2). Unless such use is permitted, the debtor must segregate and account for any cash collateral in its possession. *Id.* § 363(c)(4). As in the provisions of section 362(d), the court may authorize use of cash collateral if adequate protection is afforded the creditor's interest in the collateral. *Id.* § 363(d).

Recognizing that it must initially determine whether Buckeye has in fact a security interest in the Debtor's cash, the Court limited the evidence presented at the initial hearing on Buckeye's motion to the issue of whether a security interest was created by the indemnity contract. Although references were made to possible equitable lien rights at the hearing and large portions of the Memoranda of Law were devoted to such equitable rights, inasmuch as the pleadings and the evidence presented raised only the contractual right, this Opinion will discuss the contractual security interest only. Determination of the amount of cash collateral, if any, and the remaining issues presented by section 363 were reserved for later hearing and deliberation by the Court. Thus, the only issue which will be considered here is the extent, if any, to which Buckeye has a security interest in any cash now in the Debtor's possession.

As its name implies, Kuhn is a construction contracting business. On May 27, 1975, Buckeye and Kuhn executed a general contract of indemnity, requiring Buckeye to issue any construction bonds then or thereafter required by Kuhn. Plaintiff's Exhibit 1. Buckeye thereafter issued separate performance and payment bonds to ensure Kuhn's performance on its jobs numbered 322 through 325.[1] On June 23, 1980, Kuhn filed its chapter 11 bankruptcy petition. Buckeye apparently became aware of Kuhn's financial difficulties several days later when its local agent, the Ruffner Payne

Agency, reported finding a newspaper article indicating that Kuhn had filed bankruptcy. Transcript at 19.[2] Buckeye's first payments to materialmen and suppliers under jobs 322, 323 and 324 were made on August 1, 1980. Transcript at 38.

The indemnity contract provides that, upon default, Kuhn assigns to Buckeye "the right to collect and receive all reserve percentages and all money due and to become due" Kuhn under its construction contracts so that Buckeye might "hold and apply the same as collateral to this agreement." Plaintiff's Exhibit 1 at ¶ 14. Buckeye contends that this assignment creates a security interest in all cash received by Kuhn as progress payments on jobs 322 through 324, from the date of default. It urges that the defaults occurred as early as 1979 and, since Kuhn has no source of income other than these contract proceeds, all of the money currently held by Kuhn is subject to Buckeye's contractual security interest.

Both Kuhn and its Creditors' Committee argue that this assignment was ineffective in creating a security interest in these funds due to Buckeye's failure to observe the requirements of Article 9 of the Uniform Commercial Code [UCC] to perfect the lien. W.Va.Code § 46-9-101 *et seq.* On the other hand, Buckeye contends that the UCC is inapplicable to the instant contract.

■ Article 9 of the UCC covers consensual security interests created by contract, including assignments. W.Va.Code § 46-9-102 (1980 Cum.Supp.). Courts confronted with the difficult question of whether Article 9 was intended to cover an assignment of construction proceeds by a contractor to its surety have in general avoided deciding the issue. The courts have held that the UCC covers consensual security agreements only, not those arising by operation of law. Thus, the surety need not conform to the filing requirements of Article 9 *to enforce its equitable right of subrogation. In re J.*

---

1. There is no contention that Kuhn defaulted on the bond for job number 325, and Buckeye apparently made no payments pursuant to that bond. Therefore, no evidence relevant to bond number 325 was presented.

2. All references to "Transcript at ——" refer to specific pages of the transcript of the hearing held on September 16, 1980.

*V. Gleason Co.*, 452 F.2d 1219 (8th Cir. 1971); *National Shawmut Bank of Boston v. New Amsterdam Cas. Co.*, 411 F.2d 843 (1st Cir. 1969); *First Alabama Bank v. Hartford Accident & Ins. Co.*, 430 F.Supp. 907 (N.D.Ala.1977); *McAtee v. United States Fidelity & Guar. Co.*, 401 F.Supp. 11 (N.D.Fla.1975). In *National Shawmut Bank*, the First Circuit found that the contractual assignment of funds due or to become due the contractor does not in fact secure payment to the surety.

> [T]he real security is not the assignment of accounts receivable—which could be, failing the completion of performance, set off by the [project owner]—but the eventual right to be in the shoes of the [owner] upon job completion. This is not "created by contract" but rather by the status, resulting from a contract, inhering in a surety, quite independently of the expressed terms of the contract. [411 F.2d at 846.]

The court reasoned that a construction surety is neither insurer nor financier, both functions intended to be affected by Article 9. Moreover, the definition of "security interest" in section 1–201(37) did not "fit" the construction contract surety, whose payment is secured by the right to complete the project. In substance, the court held that the rights created by equitable subrogation, rather than by contract, are not displaced by the UCC. Thus, it rejected application of Article 9 to the surety's equitable rights, concluding that "equitable subrogation is too hardy a plant to be uprooted by a Code which speaks around but not to the issue." *Id.* at 849.

While this Court would agree that the UCC does not displace the surety's rights by way of equitable subrogation or, stated another way, that the doctrine of equitable subrogation does not create a security interest under the UCC, that is not to say that the UCC should not apply to the contractor's attempt to grant a consensual security interest to the surety. Inasmuch

as an assignment by the contractor to the surety is contractual and creates a consensual security interest, the type of security interest the UCC seeks to reach, there is no reason to hold that the UCC does not apply to the contract simply because the parties are surety and contractor. Moreover, were the contractor to assign these same rights to an entity other than a surety, such as a financier, Article 9 would apply. *See* 1 *Bender's U.C.C. Serv.* § 5A.06[3][6] (1979).

Some transfers are specifically excluded from Article 9 coverage. At first blush, section 9–104, which excludes "a transfer of a right to payment under a contract to an assignee who is also to do the performance under the contract," would appear to apply. W.Va.Code § 46–9–104(f) (1980 Cum.Supp.). However, this exception does not fit the surety-contractor situation. Generally, a surety may elect to perform or to find another contractor to perform in the event of a default in performance by the contractor whose performance it insures.[3] If the surety selects another contractor to complete the performance, that contractor, not the surety, is entitled to receive the remaining progress payments under the contract. It is logical to conclude, then, that a surety must conform to the Article 9 filing requirements to perfect a consensual security interest in any funds due or to become due to Kuhn under its construction contracts.

Thus, the cash now in the possession of Kuhn, received prior to its bankruptcy filing or subsequent to Buckeye's payments to the suppliers and the filing, is a general asset of the bankruptcy estate free from any security interest of Buckeye. Section 541 of the Bankruptcy Code states that the bankruptcy estate is comprised of all legal or equitable interests of the debtor in property at the time of filing. 11 U.S.C. § 541(a). Subsection 6 of that section makes all proceeds of such property also

---

**3.** Default under the performance bond must be distinguished from default under the payment bond. The contractor may not pay timely all materialmen and laborers, yet still continue

construction on the project. In that case, the owner may or may not declare the construction contract in default. *See* Transcript at 36.

property of the estate. *Id.* § 541(a)(6). Finally, subsection 7 includes in the estate any interest in property acquired after the commencement of the case. *Id.* § 541(a)(7). Section 541(d) provides that the estate takes whatever interest, legal or equitable, that the debtor had in such property. Thus, Kuhn's interests in the contract proceeds are a part of its bankruptcy estate.

■ Buckeye holds no greater interest in that cash than that of any other general creditor of Kuhn and, as such, is not entitled to the protection afforded by 11 U.S.C. § 363(c). The provisions of sections 502(e) and 509 of the Bankruptcy Code, however, permit Buckeye to file its claim against the bankruptcy estate, with some limitations, for reimbursement or by way of subrogation [4] to the extent necessary to fully reimburse it.

The Court will go no further at this time than to determine that Buckeye has no interest in cash now in Kuhn's possession to which the protection of section 363 could be afforded. In the Memorandum of Law, Buckeye states "[W]e will assume that there is no dispute that Buckeye has a right to the $39,100.00 now held by the various owners as retainages under the three contracts in question." Such an assumption is premature. Moreover, inasmuch as the contract retainages do not constitute cash which is the subject of Buckeye's motion, it is beyond the scope of the motion before the Court to decide who is entitled to these retainages. This, of course, does not prohibit Buckeye from seeking further relief in the future if it then finds or believes it has an interest entitling it to such relief.

An order denying Buckeye's motion to prohibit Kuhn's use of cash collateral accordingly will be entered.

---

4. Section 502(e)(1) permits the surety to file a claim against the estate for reimbursement or contribution:

> [T]he court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on, or has secured, the claim of a creditor, to the extent that—
> (A) Such creditor's claim against the estate is disallowed;
> (B) Such claim for reimbursement or contribution is contingent as of the time of allowance of such claim for reimbursement or contribution; or
> (C) Such entity requests subrogation under section 509 of this title to the rights of such creditor. [11 U.S.C. § 502(e)(1).]

The surety may elect, instead, to file a claim under section 509 of the Bankruptcy Code:

> (a) Except as provided in subsection (b) and (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.
> (b) Such entity is not subrogated to the rights of such creditor to the extent that—
> (1) A claim of such entity for reimbursement or contribution on account of a payment of such creditor's claim is—
> (A) Allowed under section 502 of this title;
> (B) disallowed other than under section 502(e) of this title; or
> (C) subordinated under section 501 of this title; or
> (2) as between the debtor and such entity, such entity received the consideration for the claim held by such creditor.
> (c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under section 509 of this title, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise. [11 U.S.C. § 509.]

In either case, section 509(c) requires subordination of the surety's claim until the creditor's claim is paid in full. The legislative history states that:

> While the foregoing scheme is equitable with respect to other unsecured creditors of the debtor, it is desirable to preserve present law to the extent that a surety or codebtor is not permitted to compete with the creditor he has assured until the assured party's claim has paid in full. Accordingly, section 509(c) of the House amendment subordinates both a claim by way of subrogation or a claim for reimbursement or contribution of a surety or codebtor to the claim of the assured party until the assured party's claim is paid in full. [124 Cong.Rec. H 11,094 (Sept. 28, 1978); S 17,410–11 (Oct. 6, 1978).]