2000-NMCA-007

996 P.2d 424

The **NEW MEXICO STATE HIGHWAY AND TRANSPORTATION DEPARTMENT, Interpleader,**

v.

**GULF INSURANCE COMPANY, a Missouri Corporation, Claimant–Appellant,**

**First State Bank of Socorro, a New Mexico Corporation, Claimant–Appellee.**

No. 19,489.

Court of Appeals of New Mexico.

Aug. 9, 1999.

Paul Maestas, Wayne R. Suggett, Silva, Rieder & Maestas, P.C., Albuquerque, for Appellant Gulf Insurance Company.

Jerry A. Armijo, Socorro, for Appellee First State Bank.

## OPINION

BUSTAMANTE, J.

{1} Having considered Gulf Insurance Company's motion for rehearing of our opinion filed June 24, 1999, we deny such motion. In doing so, we withdraw our original opinion and substitute the following.

{2} This case requires us to address an issue of first impression in New Mexico: whether a surety that issues performance and payment bonds and then satisfies claims against the contractor by paying laborers and materialmen has superior rights as against the contractor's secured creditors to final progress payments and retainage funds held by the project owner. On a motion for summary judgment, the district court apportioned the interpleaded funds between Gulf Insurance Company (Gulf), the surety, and First State Bank of Socorro (First State), the contractor's creditor. Gulf appeals the district court's judgment arguing that it has superior rights to the interpleaded funds under the doctrine of subrogation. We agree

and reverse and remand to the district court for entry of an amended judgment.

## I. FACTS

{3} In 1994, Leburt Saulsberry, doing business as Saulsberry Construction (Saulsberry), bid fence construction projects for the New Mexico State Highway and Transportation Department (State) and was awarded two projects as the successful bidder. Gulf issued performance and payment bonds on behalf of Saulsberry pursuant to the New Mexico Little Miller Act, NMSA 1978, §§ 13-4-18 to –20 (1923, as amended through 1987). Thereafter, First State made loans to Saulsberry under three separate promissory notes, totaling $57,193.04. The loans were secured by a security agreement, under which First State took an assignment of the "contract proceeds" on the State's projects. First State perfected its security interest by filing under the Uniform Commercial Code (U.C.C.), NMSA 1978, §§ 55-9-101 to –507 (1961, as amended through 1997).

{4} Later that year, Gulf received notice that Saulsberry's creditors, including laborers, materialmen, and subcontractors, had not been paid for the labor, goods, and materials they had used on the projects. Saulsberry was in fact unable to pay its creditors and thus defaulted under its obligations with the State. Gulf investigated the claims submitted by Saulsberry's creditors and determined them to be valid and within the scope of the Little Miller Act. Gulf's bonding company satisfied the claims of Saulsberry's creditors and lien claimants by paying claims totaling $80,278.73 for both projects.

{5} After the projects were completed, the State owed a total of $86,522.07 by way of final progress payments and retainage for the two projects. Gulf and First State both made demands on the State for the funds. The State filed an interpleader action against Gulf, First State, and Saulsberry, interpleading the total sum of $86,522.07 into the court registry. The district court dismissed the State from the action and ordered any parties having an interest in the funds to interplead in the action.

{6} First State then filed a Complaint to Foreclose Lien against Saulsberry and Gulf.

Gulf filed a cross-claim against First State and Saulsberry and a third-party complaint against Linda Saulsberry, Leburt Saulsberry's wife. Before the merits of the interpleader action were decided, the district court entered default judgments in favor of Gulf against Saulsberry and against third-party defendant Linda Saulsberry on the Complaint to Foreclose Lien.

{7} Gulf filed a motion for summary judgment against First State, claiming priority to the interpleaded funds. Gulf and First State submitted a pretrial order in which they stipulated to certain facts. The parties' stipulation of facts was adopted by the district court, and those findings are not challenged on appeal.

{8} After the district court entered judgment on the Complaint to Foreclose Lien, it heard oral argument on Gulf's motion for summary judgment in the interpleader action. Having fulfilled its obligations under the performance and payment bonds it previously issued on behalf of Saulsberry, Gulf claimed to have priority to the interpleaded funds pursuant to the doctrine of subrogation. First State responded by claiming it had a superior right to the interpleaded funds as a secured creditor under an assignment of rights. The district court entered an order denying Gulf's motion for summary judgment on the issue of Gulf's priority to the interpleaded funds. Instead, the district court entered judgment apportioning the funds between Gulf and First State, and dismissing the case with prejudice. Gulf received 55.123 percent, or $47,693.58, of the interpleaded funds, and First State received 44.876 percent, or $38,828.49. Gulf appeals from this judgment.

## II. DISCUSSION

{9} The only issue before us is whether Gulf, as surety, has priority to the interpleaded funds against First State's rights as a secured creditor. In the district court, First State responded to Gulf's motion for summary judgment by arguing that Gulf was required to perfect its rights under the U.C.C. in order to obtain priority to the interpleaded funds under the doctrine of sub-

rogation. On appeal, however, First State has abandoned that position and now essentially argues that the district court, sitting in equity, properly exercised its inherent powers in fashioning a remedy protective of the interests of both parties claiming the funds. In addition, First State asserts that because subrogation is based on principles of fairness, and is not constrained by common law precedent, this Court must affirm the district court's decision absent an abuse of discretion.

### A. Standard of Review

█ {10} Where a district court grants relief, an appellate court reviews for an abuse of discretion. *See Nearburg v. Yates Petroleum Corp.*, 1997–NMCA–069, ¶ 9, 123 N.M. 526, 943 P.2d 560; *see also Wolf & Klar Cos. v. Garner*, 101 N.M. 116, 118, 679 P.2d 258, 260 (1984). "Absent a clear abuse of discretion, the trial court's [decision] will not be disturbed on appeal." *Wolf & Klar Cos.*, 101 N.M. at 118, 679 P.2d at 260. We look to see whether "the court exceeded the bounds of reason[ in] all circumstances before it being considered." *Id.*

### B. Subrogation

{11} Although New Mexico has recognized the doctrine of subrogation in the suretyship context, there appears to be no New Mexico case law directly addressing the issue of whether a surety has a superior interest in the funds retained by the State against the rights of a secured creditor. *See, e.g., Bank of New Mexico v. Romero*, 1996–NMCA–065, ¶¶ 1–5, 121 N.M. 837, 918 P.2d 1337 (holding that subcontractor's surety could recover subrogation claim directly from the judgment secured by the subcontractor against the prime contractor); *Employment Sec. Comm'n v. Big 4 Paving, Inc.*, 81 N.M. 26, 27–28, 462 P.2d 611, 612–13 (1969) (quoting *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir.1967), regarding a surety stepping into the shoes of the government, for which the contracted work was to be completed); *State Farm Mut. Auto. Ins. Co. v. Foundation Reserve Ins. Co.*, 78 N.M. 359, 363, 431 P.2d 737, 741 (1967) (recognizing subrogation as a remedy in the context of a secondary insurer seeking reimbursement

from primary insurer for providing a defense to the insured). In *Romero*, this Court recognized that case law from other jurisdictions supported the surety's claim for subrogation and held that the claim could be paid directly from the judgment secured by the subcontractor against the contractor for breach of contract. *See* 1996–NMCA–065, ¶ 5, 121 N.M. 837, 918 P.2d 1337 (citing *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 138, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); *In re J.V. Gleason Co.*, 452 F.2d 1219, 1221 (8th Cir.1971); *Transamerica Ins. Co. v. Barnett Bank*, 540 So.2d 113, 115–16 (Fla.1989)). However, the competing rights of a surety and secured creditor were not at issue.

{12} According to the weight of federal authority, a surety who is called upon to complete a contract or to pay laborers and materialmen has an interest, superior to the interest of the contractor's assignee, in any funds retained by the government entity on the contract. *See, e.g., Pearlman*, 371 U.S. at 136–37, 83 S.Ct. 232; *Henningsen v. USF & G Co.*, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); *cf. Transamerica Ins. Co.*, 540 So.2d at 115–16 (adopting "'federal view' that sureties ha[ve] priority [over other creditors] by virtue of equitable subrogation"). In *Pearlman*, the United States Supreme Court firmly established the surety's superior subrogation rights. *See* 371 U.S. at 136–37, 141, 83 S.Ct. 232. The contractor in *Pearlman* entered into a construction contract with the United States government. *See id.* at 133, 83 S.Ct. 232. Because of the contractor's financial difficulties, the parties both agreed to terminate the contract, and another contractor completed the project. *See id.* at 134, 83 S.Ct. 232. However, several laborers and materialmen remained unpaid by the original contractor. *See id.* The payment bond surety for the original contractor satisfied those debts. *See id.* Thereafter, the contractor was adjudicated bankrupt, and the United States government turned over the retainage to the bankruptcy trustee. *See id.* The surety sued to recover the retainage from the trustee, claiming a superior right to the funds. *See id.* The referee in bankruptcy held that the surety had no superior right to the funds and ordered that the surety's claim be equated to

that of a general unsecured creditor. *See id.* at 134–35, 83 S.Ct. 232. The district court vacated the order and the Second Circuit affirmed. *See id.* at 135, 83 S.Ct. 232.

{13} Applying subrogation principles, and relying on two of its earlier cases, *see Henningsen,* 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; *Prairie State Nat'l Bank v. United States,* 164 U.S. 227, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896), the Supreme Court held in favor of the surety. *See Pearlman,* 371 U.S. at 136–39, 83 S.Ct. 232. The Court concluded that *Henningsen* and *Prairie State National Bank* established the surety's superior subrogation right, whether the bond was for performance or payment. *See Pearlman,* 371 U.S. at 139, 83 S.Ct. 232. Specifically, the Court held:

> [T]he Government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

*Id.* at 141, 83 S.Ct. 232.

{14} Since *Pearlman,* subsequent cases have extended the surety's subrogation rights beyond mere recovery of retainage funds to include recovery of unearned progress payments and earned but unpaid progress payments. *See, e.g., National Shawmut Bank v. New Amsterdam Cas. Co.,* 411 F.2d 843, 848 (1st Cir.1969) (earned but unpaid progress payments); *Trinity Universal Ins. Co. v. United States,* 382 F.2d 317, 320–21 (5th Cir.1967) (unearned progress payments); *but see In re Universal Builders, Inc.,* 53 B.R. 183, 186–87 (Bkrtcy.M.D.Tenn.1985) (holding that nonperfecting surety possessed no rights in progress payments entitling it to adequate protection under bankruptcy laws).

{15} In addition, subsequent cases have also held that the surety's rights are not invalidated by the surety's failure to perfect by filing a financing statement in accordance with the U.C.C. *See In re J.V. Gleason Co.,* 452 F.2d at 1222–23 (holding that surety's subrogation claim does not constitute a "security interest" under the Minnesota Uniform Commercial Code, and therefore need not be filed in order to perfect as a lien against creditors). Part of the rationale for the U.C.C.'s inapplicability is that it applies only to " 'security interests created by contract,' " while subrogation rights arise as a matter of law independent of contractual provisions. *See id.* at 1222 (quoting U.C.C. § 9–102(2) (1952)); *Jacobs v. Northeastern Corp.,* 416 Pa. 417, 206 A.2d 49, 54–55 (1965); *cf.* NMSA 1978, § 55–9–102(2) (1985) (providing that Article 9 of the New Mexico U.C.C. "applies to security interests created by contract"). Therefore, a surety has an enforceable claim to the disputed funds, even absent a filing under the U.C.C. *See Jacobs,* 206 A.2d at 54–55. In this regard, we agree with the reasoning of *National Shawmut Bank:*

> [T]here is confusion because the tendency is to think of the surety on Miller Act payment and performance bonds as standing in the shoes only of the entity it "insures"—the contractor. So long as this one-dimensional concept prevails, logic compels the surety to be assessed as merely one of the contractor's creditors, and to be subject to the system of priorities rationalized by the Uniform Commercial Code. But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety—who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

411 F.2d at 844–45; *accord Transamerica Ins. Co.,* 540 So.2d at 115–16.

{16} Requiring a payment and performance bond surety for public construction projects supports the rationale, reflected in federal cases, of giving a surety superior rights to funds retained by the government entity. *See State ex rel. Nichols v. Safeco Ins. Co.,* 100 N.M. 440, 446, 671 P.2d 1151, 1157 (Ct.App.1983) (stating that the New

Mexico Little Miller Act "is modeled after the federal Miller Act"). The New Mexico Little Miller Act provides that before the State awards any contract exceeding $25,000, the contractor must provide to the State a performance and payment bond. *See* § 13–4–18(A). The performance bond protects the State by ensuring completion of the contract, *see Employment Sec. Comm'n v. C.R. Davis Contracting Co.,* 81 N.M. 23, 26, 462 P.2d 608, 611 (1969) (stating that the New Mexico Little Miller Act "requires a bond conditioned for the performance and completion of such contract according to its terms"), while the payment bond protects laborers and materialmen associated with the contract by ensuring they will be paid, *see State ex rel. Electric Supply Co. v. Kitchens Constr., Inc.,* 106 N.M. 753, 755, 750 P.2d 114, 116 (1988) ("The Little Miller Act was enacted to protect suppliers of materials under any subcontract involving a state construction project.").

{17} Additionally, part of the purpose of withholding final progress payments and retainage funds is to protect the surety. *See Pearlman,* 371 U.S. at 137–38, 83 S.Ct. 232 (discussing rationale for holding in *Prairie State National Bank*). Like the government entity who is entitled to protect itself by using the funds to complete the project or pay lienholders, the surety can assert the right of subrogation to protect itself and may use the same remedies that were available to the government for its protection from the contractor. *See id.* Thus, by bonding the project, the surety steps into the shoes of not only the contractor, but also of the laborers and materialmen paid by it, and of the government. *See Transamerica Ins. Co.,* 540 So.2d at 115–16, 117 ("The interests of all concerned parties, whether they be contractors in default, nonsurety assignees, owners, or other obligees, are best served by prompt performance by the surety."). The equity in recognizing the surety's claim as superior to other creditors lies in the belief that subrogation is a remedy "for the benefit of one secondarily liable who has paid the debt of another and to whom in equity and good conscience should be assigned the rights and remedies of the original creditor." *State Farm Mut. Auto. Ins. Co.,* 78 N.M. at 363, 431 P.2d at 741.

{18} As Saulsberry's creditor, First State has no subrogation claim to the interpleaded funds. Instead, First State seeks to retain the funds by virtue of its position as a secured creditor. However, federal case law firmly establishes that the surety's subrogation rights are superior to U.C.C. secured creditors. *See, e.g., Pearlman,* 371 U.S. at 136–37, 141–42, 83 S.Ct. 232. We are persuaded by federal authority on this issue and hold that Gulf has superior rights to the interpleaded funds.

### C. *Inherent Powers of the Court*

■ {19} We next address First State's contention that the district court appropriately exercised its inherent powers in fashioning a remedy protective of both parties' interests. First State asserts that, when using its powers, the district court enjoys great flexibility to design relief that rewards both parties for their efforts: First State for providing the loan monies necessary to begin the projects and Gulf for satisfying the claims of laborers and materialmen.

{20} First State cites *Romero* in support of its position. *Romero* arose from a dispute between a subcontractor and a prime contractor. The subcontractor was successful in its suit for damages against the prime. The subcontractor's surety sought a lien against the verdict and judgment entered in favor of the subcontractor. We held that the surety was entitled to the lien, though we disagreed with the surety as to the amount it would recover. The surety argued its lien should be for the entire amount it paid on behalf of the subcontractor with no offsets or reductions. *See Romero,* 1996–NMCA–065, ¶ 6, 121 N.M. 837, 918 P.2d 1337 This Court held that the surety's lien should be offset by a proportionate share of attorney fees the subcontractor incurred in obtaining the judgment. *See id.; cf. Transport Indem. Co. v. Garcia,* 89 N.M. 342, 345, 552 P.2d 473, 476 (Ct.App.1976) (affirming assessment of proportionate share of litigation expenses against workers' compensation carrier seeking third-party recovery, from judgment worker won against those responsible for his injury, of amount it provided worker).

{21} The situation in *Romero* is distinguishable from the facts in this case. Here, First State, as Saulsberry's creditor, seeks to retain a share of funds interpleaded by the project owner. First State is attempting to treat the interpleaded funds as a common fund. *See Martinez v. St. Joseph Healthcare Sys.*, 117 N.M. 357, 360, 871 P.2d 1363, 1366 (1994) ("Under [the common-fund] doctrine, an attorney who creates a pool of funds for a group has the right to seek payment from the pool or seek proportional contribution from those who accept the benefits of the attorney's efforts."). However, that is not appropriate. The funds First State claims were not created as a result of its efforts—certainly not in the same sense as the funds in *Transport Indemnity* and *Martinez*, which were created by judgments against third-party tortfeasors. Thus, none of the policy reasons for imposing an obligation to assume responsibility for a fair share of the expenses incurred in creating the fund apply here. Perhaps that is why we have found no authority directly supporting First State's position, and why First State has not cited to any such authority either.

{22} In the face of the overwhelming federal authority cited above in favor of a surety's superior right to retainage funds, First State cites no direct authority for the contention that the district court nevertheless has the authority, or otherwise, to apportion the funds as it deems proper. Rather, First State cites case law that generally describes subrogation as an remedy subject to equitable principles. *See, e.g., Ford Motor Co. v. EEOC*, 458 U.S. 219, 226–27, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *Simson v. Bilderbeck, Inc.*, 76 N.M. 667, 670, 417 P.2d 803, 805 (1966); *Fidelity & Deposit Co. v. Atherton*, 47 N.M. 443, 448–49, 144 P.2d 157, 160 (1943); *Farmers Ins. Group of Cos. v. Martinez*, 107 N.M. 82, 83, 752 P.2d 797, 798 (Ct.App.1988); *Seaboard Fire & Marine Ins. Co. v. Kurth*, 96 N.M. 631, 638, 633 P.2d 1229, 1236 (Ct.App. 1980) (Sutin, J., specially concurring); *White v. Sutherland*, 92 N.M. 187, 190, 585 P.2d 331, 334 (Ct.App.1978). We agree with the principles discussed in these cases, and, in our view, they are consistent with the holdings of the federal cases discussed above. The federal cases can reasonably be interpreted to have applied the general principles discussed in the cases cited by First State to determine that a surety has superior rights to retainage funds held by the owner.

{23} In addition, we are persuaded by New Mexico case law describing the proper exercise by a court of its powers. While remedies by their nature are intended to be flexible, New Mexico has recognized limitations to the district courts' discretion. *See In re Adoption of Francisco A.*, 116 N.M. 708, 732, 866 P.2d 1175, 1199 (Ct.App.1993) (Hartz, J., specially concurring) (" '[T]he liberty of considering all cases in an equitable light must not be indulged too far; lest thereby we destroy all law; and leave the decision of every question entirely in the breast of the judge.' " (Citation omitted.) (Alteration in original.)); *Continental Potash Inc. v. Freeport–McMoran, Inc.*, 115 N.M. 690, 697, 858 P.2d 66, 73 (1993) ("Such discretion is not a mental discretion to be exercised as one pleases, but is a legal discretion to be exercised in conformity with the law."). In the instance of construction bond sureties, a balance in favor of the surety has been struck in numerous cases. In the absence of strong countervailing circumstances, explicitly taken into account, courts should follow the prior pattern of decisions rather than apply more general principles. *See Farmers Ins. Group of Cos.*, 107 N.M. at 83, 752 P.2d at 798 (stating that a subrogation case "is properly analyzed under the law governing such claims"). Here, the district court did not provide a reasoned explanation for its deviation from the established pattern.

{24} Finally, we note that the State interpleaded contract funds totaling $86,-522.07, slightly more than the $80,278.73 worth of claims Gulf paid to laborers and materialmen on Saulsberry's behalf. On remand, the district court should, of course, keep in mind that the surety's rights extend only to amounts it paid on behalf of the contractor. *See Transamerica Ins. Co.*, 540 So.2d at 117 (stating that "it is appropriate to give priority to the claims of the surety, up to the limits of its performance"). Even assum-

ing Saulsberry's agreement to indemnify Gulf under the surety bond required Saulsberry to reimburse Gulf for its litigation expenses, Gulf may not claim any priority as to its costs or attorney fees. *See Romero*, 1996–NMCA–065, ¶ 9, 121 N.M. 837, 918 P.2d 1337 (concluding that surety's litigation expenses were not properly included as part of its lien because the lien is intended to cover only the amounts the surety paid to its contractor's materialmen and subcontractors).

### III. *CONCLUSION*

{25} Because we hold that Gulf, as surety for Saulsberry, has superior rights to the interpleaded funds, we conclude that the district court erred in apportioning the interpleaded funds between Gulf and First State. Consequently, we reverse and remand to the district court for entry of an amended judgment consistent with this opinion.

{26} **IT IS SO ORDERED.**

ALARID and APODACA, JJ., concur.